**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

Q.T.,
a minor, by and through next friend Jennifer Tidd,

A.O.,
a minor, by and through next friend Pamela Ononiwu,          Civil Action No.:  1:19-cv-1285

D.O.,
a minor, by and through next friend Pamela Ononiwu,

C.T.,
a minor, by and through next friend Ashley Thomas,

COUNCIL OF PARENT ATTORNEYS AND
ADVOCATES,

AUTISTIC SELF ADVOCACY NETWORK, and

COMMUNICATION FIRST,

            Plaintiffs,

      v.

FAIRFAX COUNTY SCHOOL BOARD,

DR. SCOTT BRABAND,
SUPERINTENDENT
(in his official capacity), and

TERESA JOHNSON,
ASSISTANT SUPERINTENDENT,
DEPARTMENT OF SPECIAL SERVICES
(in her official capacity),

            Defendants.

## **COMPLAINT**

      Individual Plaintiffs, Q.T., a minor, by and through next friend Jennifer Tidd, A.O., a

minor, by and through next friend Pamela Ononiwu, D.O., a minor, by and through next friend

Pamela Ononiwu, and C.T., a minor, by and through next friend Ashley Thomas, and Organizational Plaintiffs, Council of Parent Attorneys and Advocates ("COPAA"), Autistic Self Advocacy Network ("ASAN"), and Communication First (collectively "Plaintiffs"), allege the following against Defendants Fairfax County School Board ("FCSB" or the "Board"), Dr. Scott Brabrand, Fairfax County Public Schools ("FCPS") Superintendent, and Teresa Johnson, FCPS Assistant Superintendent, Department of Special Services:

## SUMMARY

1.     Plaintiffs are students with disabilities and organizations comprised, in part, by parents of children with disabilities who bring this action to address practices and procedures illegally employed by Defendants against the most vulnerable wards in their charge.  Using highly discredited techniques, Defendants improperly and repeatedly physically restrained and secluded the Individual Plaintiffs and the members of the Organizational Plaintiffs on hundreds, if not thousands, of occasions.

2.     Plaintiffs bring this action to hold Defendants accountable for the excessive and unjustified discrimination, psychological trauma, and physical harm inflicted by their illicit use of restraints and seclusion to silence, detain, segregate, and punish students with disabilities. Plaintiffs seek relief under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131, *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. §§ 794, *et seq.*, and 42 U.S.C. § 1983 ("Section 1983") pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.

3.     Defendants' deployment of techniques more in tune with incarcerated prisoners than students with disabilities is not only egregious standing alone, but even more deplorable because Defendants' actions violate state and federal law, Defendants' own stated guidelines, and evidence-based practices on how to address students with disabilities.

2

4.      Ignoring the law as it pertains to disabilities enshrined in the ADA and Section 504, Defendants have treated students with disabilities as if they were incarcerees.  Defendants have not bothered to document their use of physical restraint and isolation as is required and have misled parents and federal oversight agencies about their use of such methods.  Defendants, who represent a major school district in the prosperous suburbs of our nation's capital, have simply ignored their fundamental and sacred duties as educators.  Through their failure or refusal to implement well recognized training and long established positive behavioral intervention techniques, Defendants have placed their staff, teachers, and students at risk of physical harm and legal liability, out of intentional disregard for the rights of students with disabilities.

5.      As detailed below, Defendants have unlawfully deployed the most restrictive forms of punishment on children whose disabilities render them often unable to communicate their needs and the harm inflicted upon them.  These children often act out their despair, pain, and isolation, through behavior that, in a vicious cycle, Defendants use as a basis to subject them to still further punishment.

6.      The parents of these students with disabilities have been excluded from any serious participation or notice about the actions taken against their children by Defendants.  Since the public school system is the legally mandated refuge of children with disabilities, it is cruel and violative of the public trust  that a public school would choose to simply ignore its duties and hide its own conduct, leaving parents incapable of gathering the necessary information to protect their children with disabilities.

7.      Physical restraints are so ineffective, dangerous, and traumatizing that many states specifically outlaw the practices or substantially circumscribe their application to a narrow range of circumstances.  In contrast, Defendants have applied these practices as a routine response to

disability-related needs or, worse, as punishment, resulting in violations of the civil and constitutional rights of students with disabilities.

8.      As detailed further below, Defendants have failed to document or limit the use of restraint and seclusion and have failed to provide sufficient and effective alternative services and other reasonable accommodations to address disability-related needs.  Rather than assess uses of restraint and seclusion, train staff, make reasonable modifications to their programs to address students' disability-related needs, and hold staff accountable for misusing these dangerous techniques, Defendants have consistently failed even to bother to collect and review data on the use of restraint and seclusion.  Instead, they have allowed their untrained staff to respond to students with disabilities with no, or limited, training and guidance, forcing staff to assume knowledge and responsibilities for responding to children with disabilities that they profoundly lack.

9.      As a result, there has been a reflexive use of restraint and seclusion because staff are not educated on how to address the disability-related need itself.  Defendants have also excluded parents of children with disabilities by withholding information about the mistreatment of their children at school and misrepresenting the frequency and breadth of their use of restraint and seclusion to the community and the Federal government.  Defendants have refused to engage in a productive dialogue that allows parents to protect their children or provide insight as to how to address the needs of those children.

10.     Defendants promise to provide "a responsive, caring, and inclusive culture where all feel valued, supported, and hopeful."[1]  In reality, they have delivered the exact opposite by

---

[1] Fairfax Cty. Pub. Schs., *Strategic Plan Goal 2: Caring Culture*, https://www.fcps.edu/about-fcps/strategic-plan/strategic-plan-goal-2-caring-culture (last visited Oct. 7, 2019).

demeaning, excluding, restraining, and punishing students with disabilities, harkening back to anachronistic concepts that students with disabilities have no place in schools and should be shunned.  Imposing physical restraints and seclusion that, in other contexts, would constitute assault or imprisonment, cannot be rationally or legally defensible.

11.     Defendants have responded to disability-related needs with exceedingly harsh, careless, and ineffective restraint and seclusion techniques without justification.  Defendants have failed to use positive interventions that are proven to be more effective at deescalating behaviors and providing students with disabilities with services designed to respond to negative or challenging disability-related needs in the most integrated setting appropriate.

12.     By relying on excessive and unnecessary restraint and seclusion in response to students with disabilities and by doing so without considering or applying more effective integrated approaches, Defendants have repeatedly violated federal law and their own guidelines on use of restraint and seclusion, thereby systematically discriminating against students with disabilities and engaging in unconstitutional seizures.

13.     Defendants have treated students with disabilities differently than they treat students without disabilities. When students with disabilities express different opinions, disagreement, or attempt to exercise agency in a manner that contravenes the expectations of FCPS staff, they are regularly restrained and removed from the classroom setting and placed in isolation cells.  This suit demands that students with disabilities be granted the same rights as nondisabled students to schools that are safe places that provide them educational opportunity and instill in them a sense of belonging and esteem.  Instead, Defendants' actions display a woeful disregard for these student's basic rights, and they need to be stopped because they are illegal, counterproductive, harmful, and ineffective.

14.     Defendants do not impose similar disciplinary responses to students without disabilities across the district.  Indeed, Defendants have applied harsher discipline against students with disabilities than for those without disabilities who engage in similar conduct.

15.     Defendants have knowingly failed to train, oversee, and hold accountable their employees for imposing physical and psychological punishments meted out to students with disabilities even when their employees recklessly depart from federal law and FCPS guidelines.

16.      Likewise, Defendants have perpetuated policies, practices, procedures, and criteria that have the effect of discriminating against such students with disabilities on the basis of disability.  In particular, Defendants have perpetuated a system that places an unnecessary reliance on and investment in seclusion rooms, SROs, and untrained teachers and staff in lieu of more integrated and effective systems and techniques, and that routinely fails to conduct appropriate assessments and implement appropriate planning and training to avoid the use of restraint and seclusion altogether.

17.     Defendants' abuses are directly and proximately caused by their knowing failure to plan, fund, and administer a system designed to respond to disability-related needs through effective means including:

a.  ensuring all students with disabilities are provided with basic reasonable accommodations to address their disability-related support needs throughout the day;

b.  strictly limiting use of restraint and seclusion on students with disabilities;

c.  appropriate training and oversight of school district staff;

d.  providing functional behavioral assessments ("FBAs"), behavioral intervention plans ("BIPs"), Multi-tiered System of Supports ("MTSS"), and Positive

Behavioral Intervention and Supports ("PBIS"), including trauma informed practices, positive educational and preventive practices and services to respond to students' disability-related needs without restraint and seclusion;

e.  providing sufficient qualified staff to implement positive behavioral support techniques;

f.  instituting effective and appropriate data collection and reporting on the use of restraint and seclusion (e.g., the number of incidents, the circumstances, and the duration) and the implementation of alternative techniques; and

g.  monitoring restraint and seclusion incidents across FCPS to ensure they are utilized only when appropriate.

18.     The lack of transparency and accountability associated with Defendants' restraint and seclusion system has chilled the rights of students and parents by depriving them of notice of the discrimination.   For example, Defendants have relied on incomplete and unreliable data collection, where it exists, typically generated after improper instances of restraint and seclusion occur, rather than a proactive monitoring of such practices.   Then, in the rare instances where such information is actually provided to parents, it is often sent long after the instance of unlawful restraint or seclusion.   Defendants have all but admitted that they failed to create a system of accountability to ensure that the most vulnerable of students are protected, infringing upon students with disabilities constitutional rights and denying them due process.   Indeed, even as this lawsuit is filed, Defendants continue to dither and formed an advisory Task Force purporting to address the conduct at issue, which is nothing more than a public relations ploy, if not an acknowledgement and admission of misconduct.

19.     Defendants' restraint and seclusion practices have substantially impaired the ability of students with disabilities to achieve their educational objectives.   There is no pedagogical purpose for Defendants' actions.

20.     Defendants also have subjected students with disabilities to unjustified segregation by unnecessarily removing them from the most integrated setting appropriate to their needs and isolating them in seclusion without cause.

21.     Moreover, often instances of restraint and seclusion have occurred across FCPS when such techniques could have been avoided altogether had Defendants provided basic and reasonable modifications required by the ADA and Section 504.

22.     As a result of Defendants' actions, Plaintiffs children and their members have suffered significant injuries and trauma, have been segregated from their peers, and have been denied valuable learning time.

23.     Despite receiving national media attention as early as March 2019, Defendants have done little, if anything, to address its misuse of restraint and seclusion on students with disabilities, other than creating a school-sponsored Task Force.

24.     Pursuant to Federal Rule of Civil Procedure 20, Plaintiffs assert their right to relief jointly and severally, or in the alternative, arising out of the same transaction or occurrence, namely Defendants' systemic use of unlawful and unjustified restraint and seclusion practices in Fairfax County.   Plaintiffs share questions of law and fact in common.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

26.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, acts, or omissions giving rise to Plaintiffs' claims have occurred in Fairfax County, Virginia and FCSB maintains its principal place of business in Fairfax County, Virginia.

27.     Plaintiffs seek injunctive and systemic relief, as well as damages, under the ADA, Section 504, Section 1983, and the U.S. Constitution, and such relief cannot be provided using the administrative procedures authorized by the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs do not seek relief related to any failure to provide them with a free appropriate public education ("FAPE"). Therefore, any effort to exhaust claims through the administrative process is unnecessary and/or futile, and the Virginia State Department of Education, Division of Special Education Services, Office of Dispute Resolution and Administrative Services responsible for hearing Section 504 matters lacks jurisdiction to correct and hear these wrongs under the ADA, Section 504, and Section 1983 and cannot award appropriate relief, including monetary damages.

## PARTIES

### Plaintiffs

28.     Q.T., a minor, files suit through his next friend, Jennifer Tidd.  Ms. Tidd and Q.T. reside in Fairfax County, Virginia.  Q.T. is a minor child who attended FCPS until he was moved into a private contract facility at FCPS' insistence and cost.  Q.T. has autism and is non-verbal, which substantially limits the major life activities of learning and communication.  He is a child with a disability under the ADA and Section 504.

29.     A.O., a minor, files suit through her next friend, Pamela Ononiwu.  Ms. Ononiwu and A.O. reside in Fairfax County, Virginia.  A.O. has been diagnosed with an emotional disability that limits the major life activity of learning.  She is a child with a disability under the ADA and Section 504.

30.     D.O., a minor, files suit through his next friend, Pamela Ononiwu.  Ms. Ononiwu and D.O. reside in Fairfax County, Virginia.  D.O. has been diagnosed with attention deficit hyperactivity disorder ("ADHD") and developmental delay.  D.O.'s disabilities limit the major life activity of learning.  He is a child with disabilities pursuant to the ADA and Section 504.

31.     C.T., a minor, files suit through his next friend, Ashley Thomas.  Ms. Thomas and C.T. reside in Fairfax County, Virginia.  C.T. has autism, sensory processing disorder, anxiety, social and emotional communication delay, and ADHD.  C.T.'s disabilities limit the major life activities of learning and communications, and he is a child with a disability under the ADA and Section 504.

32.     COPAA is a national not-for-profit organization of parents of children with disabilities, their attorneys, and their advocates.  COPAA has members that are residents of Virginia and of Fairfax County.  COPAA's primary goal is to secure appropriate educational services for children with disabilities in accordance with federal law.  COPAA provides resources, training, and information for parents, advocates, and attorneys to assist them in obtaining the equal opportunity for education such children are entitled to under the federal civil rights laws.  COPAA frequently advises and trains parents, attorneys, and advocates about challenging discrimination by schools against their children, helps parents and advocates file complaints on behalf of children with disabilities, helps parents and advocates find attorneys and legal resources as they advocate for their children's legal rights, educates policy makers, including school districts and federal agencies, about the educational experiences of students with disabilities and their families, and educates COPAA members about developments in the federal civil rights laws and policies affecting the education of students with disabilities.

33.     ASAN is a member organization run by and for autistic people.  It seeks to advance the principles of the disability rights movement with regard to autism.  ASAN works to empower autistic people across the world and advocates for systems change and ensure that the voices of autistic people are heard in various forums.  ASAN staff work to advance the civil rights of people with disabilities, to support self-advocacy in all forms, and to improve public perceptions of autism.  ASAN's members and supporters include autistic adults and youth, cross-disability advocates, and non-autistic family members, professionals, educators, and friends.  ASAN has individual members who are residents of Virginia and Fairfax County.  In recognition of the trauma that restraint and seclusion in schools causes its members and the autistic community as a whole, ASAN has devoted a significant amount of staff time to advocacy against restraint and seclusion over the past several years.

34.     Communication First is a national not-for-profit organization dedicated to educating the public, advocating for policy reform, and engaging the judicial system to advance the rights, autonomy, opportunity, and dignity of people with speech-related communication disabilities and conditions, including but not limited to, students with speech-related communication disabilities.

**Defendants**

35.     The Board is the governing body of FCPS, a school division of the Commonwealth of Virginia.  The Board directs, controls, and supervises the operation and administration of all schools, programs, and activities within FCPS and is organized under the laws of Virginia.  Va. Code Ann. § 22.1-71.  FCPS is the tenth largest school system in the country.  The Board receives federal financial assistance and is a public entity as defined in Title II of the ADA, 42 U.S.C. §§ 12131, *et seq.*, and Section 504, 29 U.S.C. § 794.  FCPS serves over 187,000 students each year.

In the 2019–2020 school year, FCPS' approved budget for the school operating fund totaled $2.9 billion.  FCPS has a staff of over 24,000.

36.     Dr. Scott Brabrand is the FCPS Superintendent.  He was elected by the Board and appointed on June 8, 2017.  Dr. Brabrand is responsible for working in conjunction with the Board and for overseeing the daily operations of FCPS, including overseeing its student disciplinary process, allocation of resources, training of employees, and methods of data collection.

37.     Teresa Johnson is the Assistant Superintendent for the FCPS Department of Special Services.   Ms. Johnson is charged with providing a planned program of instructional, psychological, social, and related services to help schools meet the needs of students with disabilities.  She is responsible for overseeing FCPS' Offices of Intervention and Prevention Services, Operations and Strategic Planning, Special Education Instruction, and Special Education Procedural Support.  In that role, Ms. Johnson is directly responsible for ensuring appropriate training for FCPS employees working with students with disabilities and for establishing appropriate systems to monitor and notify parents of incidences of restraint and seclusion, as well as reporting incidences of restraint and seclusion to the Federal government.

## STATEMENT OF FACTS

**Discriminatory and dangerous effects of restraint and seclusion on students with disabilities in public schools**

38.     The U.S. Department of Education ("U.S. DOE") Office for Civil Rights ("OCR") defines restraint and seclusion as follows:

a. Physical restraint is a "personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arms, legs, or head freely."[2] "The term physical restraint does not include a physical escort.  Physical escort means a temporary touching or holding of the hand, wrist, arm, shoulder, or back for the purpose of inducing a student who is acting out to walk to a safe location." *Resource Document* at 10.

b. Seclusion is "[t]he involuntary confinement of a student alone in a room or area from which the student is physically prevented from leaving." *Id.*  It does not include a timeout, which is a behavior management technique that is part of an approved program, involves the monitored separation of the student in a non-locked setting, and is implemented for the purpose of calming." *Id.*

39.     Since at least 2009, the U.S. DOE has recognized the dangers of restraint and seclusion of students and the discriminatory impact of schools' use of restraint and seclusion.[3] The Secretary of Education wrote that he was "deeply troubled" by testimony provided during a hearing before the Education and Labor Committee in the United States House of Representatives about the use and effects of restraint and seclusion in schools across the country.  *Duncan Policy Letter.*

40.     During that testimony, Senior Republican Member Howard McKeon stated, "All students, but especially those with disabilities, have the right to attend a school that is a safe and

---

[2] U.S. Dep't of Ed., *Restraint and Seclusion: Resource Document* 10 (May 2012), https://www2.ed.gov/policy/seclusion/restraints-and-seclusion-resources.pdf    [hereinafter *Resource Document*).

[3] Arne Duncan, *Key Policy Letters Signed by the Education Secretary or Deputy Secretary* (July 31, 2009), https://www2.ed.gov/policy/elsec/guid/secletter/090731.html [hereinafter *Duncan Policy Letter*].

rich learning environment."[4]   He went on to state that "[e]ven in cases where students with disabilities have serious discipline problems and may be a threat to themselves, it is important that teachers and classroom aides use interventions and supports that are both physically and emotionally safe for the child." *House Testimony* at 5–6.

41.     In response to the testimony provided to the Education and Labor Committee, the U.S. DOE Secretary urged schools across the country to "develop or review and, if appropriate, revise . . . State policies and guidelines to ensure that every student in every school . . . is safe and protected from being unnecessarily or inappropriately restrained or secluded." *Duncan Policy Letter*.

42.     Consistent with the guidance provided by the U.S. DOE, in September 2009, the Virginia Department of Education ("VDOE") developed its own guidelines to "provide assistance to school divisions and public school programs in Virginia regarding the writing of policies and procedures for physical restraint and seclusion of students in emergency situations."[5]   The 2009 Guidelines are "pertinent to the management of all children's violent behavior in emergency situations in Virginia's public schools." *2009 Guidelines* at 1.

43.     The VDOE  2009 Guidelines provide in pertinent part:

    a. Every child shall be "treated with respect and dignity," that the "learning environment [be] safe for all students and staff," and "**[w]here possible, less**

---

[4] *Examining the Abusive and Deadly Use of Seclusion and Restraint in Schools: Hearing before the House Comm on Educ. and Labor*, 111th Cong. 19, 5 (May 19, 2009), https://www.govinfo.gov/content/pkg/CHRG-111hhrg49597/pdf/CHRG-111hhrg49597.pdf [hereinafter *House Testimony*].

[5] Va. Dep't of Educ., *Guidelines for the Development of Policies and Procedures for Managing Student Behaviors in Emergency Situations in Virginia Public Schools Focusing on Physical Restraint and Seclusion* 1 (Sept. 2009), http://www.doe.virginia.gov/support/student_conduct/guidelines_managing_behaviors_emergency.pdf (footnote omitted) [hereinafter *2009 Guidelines*].

**restrictive measures should be used initially and no intervention should remove a student from the learning environment for unreasonable or unnecessary periods[,]"** *id.* at 4 (emphasis in original);

b. "When the behaviors have been addressed, returning the student to the learning environment is paramount[,]" *id.*;

c. "School divisions must ensure that any action taken does not violate constitutional protections, especially in terms of an individual's due process rights, and that policies contain assurances of students' rights[,]" *id.* at 6;

d. All school systems must consider "[a]ll federal and state statutes, and any implementing regulations" when creating their own "requirements for using physical restraint and seclusion," and specifically sections 22.1-276, *et seq.*, of the "*Code of Virginia* relative to discipline in and by regulations set forth by the Board of Education in 8VAC20-81-10 relative to students with disabilities[,]" *id.*; and

e. "Neither the statutes nor the regulations authorize the use of any abusive techniques or interventions with students in Virginia's public schools." *Id.*

44.    To ensure proper implementation of its policy and to detect uses of restraint and seclusion, the 2009 Guidelines provide that each incident of restraint and/or seclusion should be memorialized and documented to include the following:

a. "the circumstances under which physical restraint or seclusion occurred," *id.* at 17;

b. "a description of the incident, including the date, time, location of incident, persons involved partially and fully, and other relevant details," *id.*;

15

    c.   "a justification statement setting forth why physical restraint, seclusion, or other behavioral interventions were necessary," *id.*;

    d.   "a substantial explanation why less intrusive interventions were deemed inappropriate or inadequate," *id.*; and

    e.   "a comprehensive list of persons who must be informed or notified of the incident." *Id.*

45.    Moreover, the 2009 Guidelines require schools to, at a minimum, create a reporting process that include:

    a.   "the procedures for informing school/program administration," *id.* at 18;

    b.   "the procedures for informing parents," *id.*; and

    c.   "the procedures for transmitting the report to a review committee where a determination would be made on whether the school division's policies and procedures have been followed." *Id.*

46.    Regarding investigating injuries sustained by students and other complaints, the 2009 Guidelines state: "It is essential that all injuries, incidents, accidents, or other related activities be fully documented at the time they occur," and that "[i]n any complaint process, it is essential that all parties involved be identified, the time of actions be recorded fully, the events and behaviors preceding the incident be investigated, and any other relevant data or evidence be documented." *Id.*

47.    Relating to training, the 2009 Guidelines provide that all staff be trained on "the use of behavior management techniques, physical restraint, and seclusion in emergency situations." *Id.* at 15. Moreover, school divisions "should ensure that everyone concerned has information on these interventions and should decide who needs to receive specific training." *Id.*

48. The 2009 Guidelines also provide minimum training requirements including, *inter alia*:

   a. "interventions and alternatives that may preclude the need for physical restraint and seclusion (e.g., de-escalation of problematic behavior)," *id.*;

   b. "administering physical restraint and implementing seclusion procedures in accordance with established medical or psychological limitations and when applicable, as specified in a student's Behavioral Intervention Plan (BIP)," *id.* at 16; and

   c. "procedures to be followed when documenting and reporting incidents of physical restraint or seclusion to parents and school administration." *Id.*

49. The 2009 Guidelines allowed a school system to "choose to use this information at its discretion in developing procedures that will help in situations involving the management of challenging student behaviors." *Id.* at 1.

50. Further, the 2009 Guidelines are in effect an established standard of care that can be referenced when determining the appropriateness of a school system's actions.

51. In May 2012, the U.S. Secretary of Education issued additional guidance directing schools to review their policies on restraint and seclusion, develop or revise policies and guidelines, and publicize those policies "so that administrators, teachers, and parents [could] understand and consent to the limited circumstances under which these techniques may be used[.]" *Resource Document* at 5.

52. It has been widely recognized that restraint and seclusion of students, and particularly of students with disabilities, can be harmful and discriminatory, and that it should be limited to those situations in which the student's "behavior poses imminent danger of serious

physical harm to self or others and other interventions are ineffective and should be discontinued as soon as imminent danger of serious physical harm to self or others has dissipated." *Id.* at iii.

53.     The *Resource Document* explained that school districts should:

a.  "ensure that parents are notified when" restraint and seclusion is used, *id.* at 5;

b.  "provide the resources needed to successfully implement" appropriate policies limiting the use of restraint and seclusion, *id.*; and

c.  implement PBIS as a "important preventive approach that can increase the capacity of the school staff to support children with the most complex behavioral needs, thus reducing the instances that require intensive interventions." *Id.* at 5. *See also id.* at 3.

54.     Starting in the 2009–2010 school year, the U.S. DOE OCR required "reporting of the total number of students subjected to restraint or seclusion disaggregated by race/ethnicity, sex, limited English proficiency status, and disability, and to collect the total number of times that restraint or seclusion occurred." *Id.* at 5.

55.     The *Resource Document* outlines Fifteen Principles that States, local school districts, and other stakeholders should consider as the framework for developing policies and procedures on restraint and seclusion "to ensure that any use of restraint or seclusion in schools does not occur, except when there is a threat of imminent danger of serious physical harm to the student or others, and occurs in a manner that protects the safety of all children and adults at school." *Id.* at 6.

56.     In December 2016, the U.S. DOE Assistant Secretary clarified in a "Dear Colleague" letter that there are "limits that Federal civil rights laws [such as the ADA and Section

504] impose on the use of restraint and seclusion by public elementary and secondary school districts."[6]

57.    According to the U.S. DOE OCR:

> A school district discriminates on the basis of disability in its use of restraint or seclusion by (1) unnecessarily treating students with disabilities differently from students without disabilities; (2) implementing policies, practices, procedures, or criteria that have an effect of discriminating against students on the basis of disability or defeating or substantially impairing accomplishment of the objectives of the school district's program or activity with respect to students with disabilities; or (3) denying the right to a free appropriate public education . . . .

*2016 Dear Colleague Letter* at 3.

58.    One section of the *2016 Dear Colleague Letter* outlines the Legal Standards OCR uses to determine whether the use of restraint or seclusion has violated Section 504 and Title II. This section provides, in pertinent part:

a.    Restraint and seclusion is only justified in instances where a "student's behavior poses **imminent danger of serious physical harm to self or others**," and would not "find the **repeated** use of restraint and seclusion to be a justified response where alternative methods also could prevent imminent danger to self or others," *id.* at 9 (emphasis added);

b.    A school district is required to provide special education or related services "[w]hen a school district suspects a student may have a disability because of social, emotional, or behavioral needs," *id.* at 10;

---

[6] Catherine E. Lhamon, *Dear Colleague Letter: Restraint and Seclusion of Students with Disabilities*, U.S. Dep't of Educ. Off. for Civil Rights, 1 (Dec. 28, 2016) https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201612-504-restraint-seclusion-ps.pdf [hereinafter *2016 Dear Colleague Letter*].

c.  To address those needs, "the evaluation and placement process must draw upon information from a variety of sources and include an assessment of the student's social, emotional, or behavioral needs to address the identified concerns," *id.* (footnote omitted); and

d.  "[W]hen a school district has reason to believe that the student's educational needs are not being met, it must consider different or additional approaches or services to address the student's behavioral needs," including, if necessary "reevaluat[ing] the student, which could include evaluating the need for positive behavioral interventions and supports and other strategies to address the student's behavior that could mitigate or eliminate the need for restraint and seclusion." *Id.* at 11 (footnotes omitted).

59.     The *2016 Dear Colleague Letter* explains that evidence of unlawful discrimination on the basis of disability can be discerned from any available data as well as the school district's policies, practices, procedures, and criteria relating to restraint and seclusion. *Id.* at 3.

60.     Data collected by the Federal government has shown that in the 2015–16 school year, although students with disabilities made up only 12% of all students enrolled in public schools across the country, they were nevertheless the subject of 71% of incidences of restraint and 66% of incidences of seclusion.[7]   Another study from 2001 revealed that seclusion "may cause additional trauma and harm," and "the practice of seclusion does not add to therapeutic goals and is in fact a method to control the environment instead of a therapeutic intervention."[8]

---

[7] U.S. Dep't of Ed. Off. for Civ. Rights, *2015–16 Civil Rights Data Collection School Climate and Safety* 12 (May 2019), https://www2.ed.gov/about/offices/list/ocr/docs/school-climate-and-safety.pdf.

[8] Linda Finke, *The Use of Seclusion is Not an Evidence-Based Practice*, 14 J. Child & Adolescent Psychiatric Nursing 186, 189 (2001).

61.     The Council for Children with Behavioral Disorders ("CCBD") has highlighted the traumatic effects restraint and seclusion can have on children.  For restraint, CCBD explains that effects "range from short-term such as fear and an adrenaline rush of physical confrontation to long-term effects such as Post Traumatic Stress Disorder."[9]  Effects relating to seclusion are "the continuing significant psychological damage and the potential of physical injury and even death . . . ."[10]

62.     The trauma inflicted upon children from unlawful restraint and seclusion has been documented by the United States Government and Accountability Office ("U.S. GAO").  In a 2009 report, the U.S. GAO explained that "[e]ven if no physical injury is sustained, . . . individuals can be severely traumatized during restraint."[11]  The results of such trauma can include "hyperactivity, anxiety, behavioral impulsivity, sleep problems, tachycardia, hypertension, and a variety of neuroendocrine abnormalities," causing children to respond to threats in a "'fight or flight' reaction."[12]

---

[9] The Council for Children with Behavioral Disorders, *CCBD's Position Summary on The Use of Physical Restraint Procedures in School Settings* 5 (July 8, 2009), https://higherlogicdownload.s3.amazonaws.com/SPED/bc40048c-cf24-4380-a493-273ff305ca3c/UploadedImages/CCBD%20Position%20on%20Use%20of%20Restraint%207-8-09.pdf.

[10] The Council for Children with Behavioral Disorders, *CCBD's Position Summary on The Use of Seclusion in School Settings* 5 (July 8, 2009), https://higherlogicdownload.s3.amazonaws.com/SPED/bc40048c-cf24-4380-a493-273ff305ca3c/UploadedImages/CCBD%20Position%20on%20Use%20of%20Seclusion%207-8-09.pdf.

[11] U.S. Gov't Accountability Off., *Seclusions and Restraints Selected Cases of Death and Abuse at Public and Private Schools and Treatment Centers* 1 (May 19, 2009), https://www.gao.gov/new.items/d09719t.pdf.

[12] Bruce D. Perry, et al., *Childhood Trauma, the Neurobiology of Adaptation, and "Use-dependent" Development of the Brain: How "States" Become "Traits"*, 16 Infant Mental Health J. 271, 277–78 (1995), http://media.wix.com/ugd/29cec4_4951bdf3fb444a62b01f2da71e4a4cae.pdf.

63.     According to OCR, "[a] school's use of restraint or seclusion may have a traumatic impact on a student, such that even if she were never again restrained or secluded, she might nevertheless have new academic or behavioral difficulties . . . That traumatizing effect could manifest itself in new behaviors, impaired concentration or attention in class, or increased absences . . . ."[13]

64.     Research shows that restraint and seclusion "destroy the trusting relationship between students and teachers which is essential to learning and progress," *House Testimony* at 83, and that "virtually no evidence to support" the notion that restraint and seclusion can change a student's undesired behavior, *id.* at 21.

65.     Restraints and seclusion are less effective than alternative approaches, such as positive behavioral supports.  For example, MTSS provides a framework for educators to identify students' behavioral needs.  MTSS practices include "collaborative and team-based decision making to determine" a student's needs and appropriate interventions, building active involvement between teachers and parents.[14]  Safer and less traumatic interventions like MTSS have been successfully implemented in school systems and are linked to positive outcomes such as greater academic achievement, fewer disciplinary problems, and decreased injury to school staff.

**Defendants have failed to take effective action to comply with the requirements of federal laws protecting the rights of students with disabilities regarding restraint and seclusion.**

66.     In 2012, Defendants finally purported to begin following the federal call to limit the use of restraint and seclusion by adopting their *Guidelines on the Use of Physical Restraint*

---

[13] U.S. Dep't of Ed. Off. for Civ. Rights, *Fact Sheet: Restraint and Seclusion of Students with Disabilities* 1 (Dec. 28, 2016), https://www2.ed.gov/about/offices/list/ocr/docs/dcl-factsheet-201612-504-restraint-seclusion-ps.pdf.

[14] PBIS Rewards, *What is MTSS*, https://www.pbisrewards.com/blog/what-is-mtss/ (last visited Oct. 7, 2019).

*and Seclusion for Students with Disabilities Receiving Special Education Services.*[15]   The pertinent provisions of the *FCPS Guidelines* provide:

   a.   "The right to be educated in a safe and supportive climate of success extends to all students at all times, in all school environments[,]" *FCPS Guidelines* at 5;

   b.   "When managing student behavior, physical restraint and seclusion are safety procedures used when less restrictive alternatives have failed, and the student is an immediate danger to him or herself and/or others. The use of abusive or aversive interventions, including corporal punishment, is expressly prohibited," *id.*; and

   c.   "Each principal or program administrator will determine a time and method to ensure that appropriate staff members, parents, and students are familiar with the school division's policies and procedures regarding the use of behavior management techniques, physical restraint, and seclusion in dangerous situations." *Id.* at 8.

67.   As it relates to training, *FCPS Guidelines* provide that training should include, but not be limited to:

   a.   "Methods and procedures for de-escalating and assisting students to self-manage using non-physical means, as well as certification in research-based physical management techniques using the least restrictive options to ensure the safety of all involved," *id.*;

---

[15] The 2012 Guidelines were amended in March 2019 but remain substantively unchanged.  *See* Fairfax Cty. Pub. Schs., *Guidelines on the Use of Physical Restraint and Seclusion for Students with Disabilities Receiving Special Education Services* (Mar. 2019), https://www.fcps.edu/sites/default/files/media/pdf/PhysicalRestraintSeclusion.pdf   [hereinafter *FCPS Guidelines*].

b.  "Interventions and alternatives that may preclude the need for physical restraint and seclusion (e.g., de-escalation of problematic behavior and the conflict cycle)," *id.*;

c.  "Related safety and medical considerations, including information regarding the increased risk of injury to the student and/or school personnel when physical restraint is implemented or a student is secluded," *id.*; and

d.  "Instruction regarding incident documentation and reporting requirements, and the procedures for investigating injuries and complaints."  *Id.*

68.     *FCPS Guidelines* outline measures to be taken when restraint and/or seclusion is used, including, but not limited to:

a.  Prohibiting the use of physical restraint and/or seclusion in the management of severe student behavior unless there is a dangerous situation and physical restraint and/or seclusion is necessary to protect the student or another person or persons, *id.* at 9, 10;

b.  Requiring other less intrusive interventions be used and providing an explanation for why other interventions were deemed inadequate or inappropriate, *id.*;

c.  Prohibiting physical restraint and/or seclusion from being used as a teaching procedure or behavioral intervention and prohibiting restraint and/or seclusion as punishment or to address behaviors that are not dangerous or for non-emergency reasons, such as noncompliance, disrespect, disobedience, misuse or destruction of property or disruption, *id.* at 5, 6, 9, 10;

d.  Limiting the use of physical restraint and/or seclusion only for the period of time that is necessary to contain the behavior of the student, so that the student no longer

poses an immediate threat of causing physical injury to self or others, *id.* at 6, 9, 10;

e.  Restricting the use of force in the application of physical restraint and/or seclusion so that it does not exceed the force that is reasonable and necessary under the circumstances that precipitated the use of the physical restraint, *id.* at 9, 10;

f.  Requiring staff members to monitor the student for any safety or medical concerns, including risk of injury, *id.*;

g.  Mandating that each incident of restraint and/or seclusion be documented using specific FCPS forms, copies of which must be sent home to parents to provide adequate notification of incidents of restraint and/or seclusion, *id.* at 9–11, 14–15;

h.  Requiring a school administrator or designee to inform the parents or guardians of the student of the incident requiring the physical restraint or seclusion in writing and by phone within 24 hours, *id.* at 9, 11; and

i.  Requiring school staff members to comply with all procedures outlined in *FCPS Guidelines* involving investigation of complaints and/or corrective measures if warranted.  *Id.*

69.  In 2015, Virginia Code § 22.1-279.1:1, was enacted, providing:

> The [VDOE] shall adopt regulations on the use of seclusion and restraint in public elementary and secondary schools in the Commonwealth that (i) are consistent with its **Guidelines for the Development of Policies and Procedures for Managing Student Behavior in Emergency Situations and the Fifteen Principles contained in the U.S. Department of Education's Restraint and Seclusion: Resource Document**; (ii) include definitions, criteria for use, restrictions for use, training requirements, notification requirements, reporting requirements, and follow-up requirements; and (iii) address distinctions, including distinctions in emotional and physical development, between (a) the general student population and the special education student population and (b) elementary school students and secondary school students.  **The Board shall**

**specifically (1) identify and prohibit the use of any method of restraint or seclusion that it determines poses a significant danger to the student and (2) establish safety standards for seclusion.**

(Emphasis added.)

70.    In short, the Fifteen Principles enshrined in the *Resource Document* became a legal mandate, not a suggestion.

71.    Although VDOE has yet to enact such regulations, Defendants have been aware that such regulations adopting the Fifteen Principles set forth in the *Resource Document* are forthcoming and that Virginia Code § 22.1-279.1:1 already obligates Defendants to follow them.

72.    Despite their own guidelines and knowledge of state law, and that state regulations are being promulgated, Defendants have, for years, violated their own policies, federal law, and the United States Constitution by improperly restraining and secluding students with disabilities and subjecting them to unlawful seizures and depriving them of due process and equal protection in violation of their constitutional rights.

73.    Following widespread news reports of abuses involving improper and unreported restraint and seclusion, FCPS has responded, not by shifting resources to provide PBIS, not by training teachers or increasing staffing resources, not by adopting policies to restrict and oversee the use of restraint and seclusion, but by organizing a quasi-governmental Task Force ostensibly to consider the issue of restraint and seclusion and how to "improve" on school procedures.

74.    Upon information and belief, Defendants' Task Force, created in June 2019 to advise Dr. Brabrand as to how Defendants can alter their policies surrounding restraint and seclusion, has produced no public deliverables or deadlines, has no members with backgrounds in the educational, psychological, or legal standards applicable to policies on restraint and seclusion and the harm such practices can have on children with disabilities, and relies on a single, unqualified individual who has no educational or psychiatric background to survey and research

26

uses of restraint and seclusion and provide the Task Force with recommendations for alternatives to restraint and seclusion.

75.     Moreover, the Task Force has not been tasked with considering how to remedy any harm that has already occurred. The Task Force was closed to the wider public, parents, and families, including Plaintiffs, until October 2019 and, to date, has produced no public records of any meeting or comments provided to it. Meanwhile, the unjustified and harmful use of physical violence and seclusion rooms continues unabated against students with disabilities.

**Defendants have systematically subjected children with disabilities to unnecessary restraint and seclusion and concealed their unlawful actions from parents and the Federal government.**

76.     *FCPS Guidelines* first adopted in 2012 purport to limit the use of physical restraint and seclusion to instances "when less restrictive alternatives have failed and [when a] student is an immediate danger to him or herself and/or others." *FCPS Guidelines* at 5.

77.     Defendants' own guidelines also require that "no intervention should remove a student from the learning environment for unreasonable or unnecessary periods of time. When the behaviors have been addressed, returning the student to the learning environment is important." *Id.*

78.     Despite their own guidelines, Defendants have, for years, allowed their employees and agents to restrain and seclude children with disabilities without requiring them to exhaust the use of less restrictive measures and accommodations. FCPS has also condoned the repeated use of restraint and seclusion techniques when student behavior poses no immediate danger. Defendants have used restraint and seclusion as a common disciplinary method for students with disabilities, rather than limiting those techniques to emergency situations where no alternative exists.

79.     Thus, Defendants have invoked restraint and seclusion as a *de facto* disciplinary method for students with disabilities, routinely making unlawful seizures, rather than reserving restraint and seclusion to rare instances that are emergency in nature.

80.     Moreover, Defendants have subjected Individual Plaintiffs to restraint and seclusion for unnecessarily long periods of time, sometimes day after day, in violation of their constitutional rights.

81.     Upon information and belief, Defendants utilize SROs who are not trained in PBIS, other de-escalation techniques, or appropriate ways to interact with children with disabilities. FCPS staff frequently call upon SROs to restrain and seclude children with disabilities.[16]

82.     Defendants have failed to appropriately support alternatives to restraint and seclusion or train FCPS staff to implement such alternatives, despite having ample resources to do so.  For example, in fiscal year 2019, Defendants allocated just $1.3 million of their $2.9 billion budget (less than ½ of 1 percent) for their "Positive Behavior Approach" program.[17]  This program supports only eight positions dedicated to positive behavioral supports for the entirety of FCPS, *FCPS 2019 Budget* at 174, that is, "over 190,000 students across 198 schools and centers[,]" *id.* at 253.  In contrast, during the same year, Defendants dedicated $4.7 million to "Alternative Learning Centers," *id.* at 85, which segregate students with disabilities from the general education population.[18]

---

[16] Such officers are law enforcement personnel pursuant to Va. Code Ann. § 9.1-101 and are state actors for federal statutory purposes.

[17] Fairfax Cty. Pub. Schs., *Fiscal Year 2019 Program Budget*, fcps.edu 174 (2019), https://www.fcps.edu/sites/default/files/media/pdf/FY-2019-Program-Budget_1.pdf  [hereinafter *FCPS 2019 Budget*].

[18] *See also* Jessica Butler, *How Safe is the Schoolhouse?  An Analysis of State Seclusion and Restraint   Laws   and   Policies   4   (July   10,   2019),* http://www.autcom.org/pdf/HowSafeSchoolhouse.pdf ("While  Virginia  has  not  adopted

83.     Recent media reports highlight how Defendants have blatantly disregarded the civil rights of FCPS students with disabilities and subjected them to unnecessary and unreasonable restraint and seclusion as a matter of course.[19]  Defendants have done so without considering more integrated alternatives and accommodations, or examining whether a student's actions even came close to the standard of constituting an immediate danger to self and/or others.

84.     For example, one news report revealed that there are hundreds of cases in FCPS where children as young as six years old were restrained and secluded for actions that did not pose an imminent threat to self or others.  A parent reported that her child who has been diagnosed with autism was kept in a seclusion room "every day," that "[h]e basically lived in that room," and "each time [Defendants] put him in seclusion, it made him act out more."[20]  These seclusion rooms, "built like Russian nesting dolls," are used when students with disabilities act out, often exacerbating the very behaviors that Defendants' employees and agents should be trying to address.  *Isolated.*

85.     In spite of *FCPS Guidelines* requiring a "building principal, or designee" to "make good faith efforts to contact a parent or guardian of the student who has been physically restrained [or secluded] as soon as is reasonable, but certainly within 24 hours of the time when the restraint

---

regulations [on restraint and seclusion], its largest district, Fairfax County, allocated $1 million to prevent the use of restraint and seclusion, after finding it likely that staff were not following guidelines.").

[19] *See, e.g.*, Matthew Walther, *The Torture Chambers Down the Street*, theweek.com (Mar. 25, 2019), https://theweek.com/articles/830630/torture-chambers-down-street; Jenny Abamu, *This Is What "Seclusion" Looks like at One Fairfax County School*, wamu.org (Mar. 21, 2019), https://wamu.org/story/19/03/21/video-this-is-what-seclusion-looks-like-at-one-fairfax-county-school/.

[20] Jenny Abamu, *Children are Routinely Isolated in Some Fairfax County Schools.  The District Didn't Report It*, wamu.org (Mar. 13, 2019), https://wamu.org/story/19/03/13/children-are-routinely-isolated-in-some-fairfax-county-schools-the-district-didnt-report-it/         [hereinafter *Isolated*].

[or seclusion] occurred," *FCPS Guidelines* at 9, 11, Plaintiffs and other parents have routinely been denied notification from FCPS of incidents of restraint and seclusion against their children.

86.     Upon information and belief, Defendants use terms such as "quiet rooms," "resource suites," "reflection rooms," "exclusion," and placing students "into support" to avoid documenting incidents of seclusion and providing notice to parents of same.

87.     Even when Defendants have notified parents of the restraint and seclusion of their children, such documentation is often inadequate, lacking a description or analysis of what triggered a child's restraint and/or seclusion, or provided long after-the-fact.

88.     Defendants appear to have actively sought to conceal their abuse from the public eye.  Despite collecting data since 2013, Defendants knowingly and falsely reported **zero** instances of restraint and seclusion to the Federal government from 2013·to 2017.  Those reports were made despite documentation showing that one child alone was restrained or secluded at least 82 times during the 2013–14 school year.

89.     Defendants' failure to maintain adequate records has directly and proximately resulted in erroneous reports to the Federal government, parents, and the public regarding restraint and seclusion performed on students in their custody and care.  While some parents have received hundreds of pages of documentation identifying instances of restraint and seclusions, others are left in the dark.  Parents report that they learned from their children for the first time that they were restrained or placed in seclusion rooms, without any notification from Defendants.  Other parents only learned that their child was restrained or secluded by observing it firsthand because they happened to walk into their child's school at the very moment the restraint or seclusion was taking place.

90.     In response to the media coverage of Defendants' unlawful abuse of students with disabilities, Defendants have all but admitted liability, yet have not taken sufficient preventative or deterrent action to stop the systemic abuse of students with disabilities from continuing.

91.     In an article published by the Washington Post, Dr. Brabrand is quoted as stating that Defendants "have been remiss in [their] data collection and data reporting requirements for many years."[21]

92.     On April 2, 2019, Defendants conducted an emergency work session of the FCPS Board, lasting over 3.5 hours, to discuss Defendants' rampant use of restraint and seclusion.[22]

93.     During that meeting, Dr. Brabrand acknowledged, "It is clear that as a system, we have fallen short in" Defendants' policies and practices around restraint and seclusion. *Work Session*.

94.     Later in the meeting, Dr. Brabrand admitted that Defendants have not focused on "accountability structures." *Id.*

95.     Ms. Johnson acknowledged that parent notification forms are the sole source of data regarding incidences of restraint and seclusion. *Id.* Nevertheless, she also acknowledged that FCPS does not have a system for maintaining these documents and that underreporting and the lack of adequate data collection "is a concern." *Id.*

96.     Ms. Johnson further stated, "We recognize that the way schools are reporting this manual process has resulted in inconsistencies across [FCPS]." *Id.* Ms. Johnson stated that

---

[21] Debbie Truong, *Fairfax Students were Secluded or Restrained Nearly 1,700 Times Last Year*, The Wash. Post (April 7, 2019), https://www.washingtonpost.com/local/education/fairfax-students-were-secluded-or-restrained-nearly-1700-times-last-year/2019/04/07/e1f01cde-57b3-11e9-9136-f8e636f1f6df_story.html.

[22] Fairfax Cty. Pub. Schs., *FCPS School Board Work Session–Discussion on Seclusion and Restraint 04-02-2019*, YouTube (Apr. 5, 2019), https://www.youtube.com/watch?v=xPN5AvoxGWA [hereinafter *Work Session*].

although FCPS belatedly reported that a total of 1,679 instances of restraint and seclusion occurred during the 2017–18 school year, the actual number of incidences of restraint and seclusion, for that year and for those when FCPS falsely reported zeros, remains unknown because "those numbers were gathered off the forms [FCPS] has collected as a system," and, therefore, Ms. Johnson "would not have confirmation." *Id.*

97.     The lack of notice to parents concerning restraint and seclusion was also discussed at the April 2, 2019 Board Work Session. *Id.* Ms. Johnson committed to community engagement and to "explore additional [stakeholder] groups for outreach . . . ." *Id.*

98.     Even after discussion of the widely publicized numerous improper incidents of restraint and seclusion across FCPS, and several acknowledgments by Dr. Brabrand and Ms. Johnson that FCPS has "fallen short"—including, *inter alia*, in providing notice to parents, collecting data, and monitoring restraint and seclusion—FCPS officials have failed to take appropriate action to address these systemic problems and constitutional violations.

99.     According to *FCPS Guidelines*, "When it has been determined that seclusion or physical restraint was improperly implemented, corrective measures shall be undertaken by FCPS." *FCPS Guidelines* at 11–12. However, *FCPS Guidelines* are silent on what, if any, process FCPS follows to recognize or correct its abusive use of restraint and seclusion. Defendants' failure to notify parents or collect accurate data on the use of restraint and seclusion demonstrates that, in practice, FCPS does not even know when restraint and seclusion are used, let alone assess whether their use was proper or implement any corrective measures.

100.     Defendants' lack of monitoring, lack of accountability, and lack of training has resulted in routine, unnecessary, and unconstitutional restraints and seclusions, including upon Plaintiffs, which are:

a.   Unsafe, unreasonable, and unwarranted;

b.   Not an emergency;

c.   Conducted without informing parents within 24 hours;

d.   Conducted without giving parents procedural safeguards;

e.   For periods of time longer than necessary; and

f.   Imposed without considering alternatives or accommodations and without documenting the situation that led to use of restraint and/or seclusion.

101.   Defendants' improper actions and their devastating effects are illustrated by the mistreatment of Individual Plaintiffs' children with disabilities.

## HARM TO PLAINTIFFS

### Q.T.

102.   Over the course of seven years from 2011 to 2018, from the ages of five to twelve, Q.T., a thirteen-year-old, non-verbal student with autism, was restrained and secluded at least approximately 745 documented times by Defendants' staff or their agents.

103.   A total of at least 422 instances of restraint and seclusion initially occurred in a general education setting, and at least an additional 323 incidents of restraint and seclusion occurred after Q.T. was moved, at FCPS' insistence and cost, into a private contract facility.

104.   On those approximately 745 occasions, Q.T. was first physically restrained in the classroom and then placed in a six-by-six-foot padded room with a magnetically locked door, where he was left in isolation.

105.   For example, while attending Kennedy Krieger, Q.T. was placed in "exclusion," i.e., a solitary, isolated room where he received instruction alone without any other children present.  The isolation room Q.T. was placed in was surrounded by four adjacent seclusion cells. Q.T. was only permitted to leave "exclusion" to use the restroom.  Q.T. spent two consecutive

months in "exclusion." The only way he was permitted to leave was to earn his way back out through what Defendants' deemed to be good behavior for three consecutive days. Despite Ms. Tidd's pleas to curtail this type of extreme measure given the increasing distress she witnessed her child experiencing, Defendants did nothing and continued to place Q.T. in "exclusion."

106. Upon information and belief, Q.T.'s last known incident of restraint or seclusion by Defendants and/or their agents occurred on October 12, 2018, at Kennedy Krieger School in Silver Spring, Maryland, which was under contract with Defendants and, at all times relevant, acted as an agent of Defendants.

107. Q.T. has been left in seclusion rooms and removed from his peers for hundreds of hours. Ms. Tidd did not receive formal or appropriate documentation or notice of these instances within 24 hours pursuant to *FCPS Guidelines*.

108. Indeed, Ms. Tidd did not receive formal or appropriate documentation or timely notices pursuant to *FCPS Guidelines* for many of these incidents until years after the incidents occurred. Ms. Tidd did not receive documentation for some of these instances of restraint and seclusion until the summer of 2015, after she obtained counsel who submitted a Freedom of Information Act request on her behalf. The documentation she received revealed to her for the first time the previous four years of Q.T.'s systematic and unlawful restraint and seclusion by Defendants. Nevertheless, Q.T. continued to be unlawfully restrained and secluded until 2018.

109. Q.T. was regularly secluded for reasons that did not pose an imminent threat to himself or others in violation of his constitutional rights. For example, in one instance he was secluded after exhibiting escalating behaviors that initially arose from throwing his headphones in a toilet.

34

110.    In addition to those 745 documented incidences, Q.T. was regularly secluded in "quiet rooms" for similar reasons that did not pose an imminent threat to his own safety or the safety of others.

111.    At times and in order to escape, Q.T., who had been potty trained since the age of five, soiled himself until released.  In some instances, Defendants' staff or their agents gave Q.T. rubber gloves and a disinfectant wipe and instructed him to go back into the seclusion cell to clean up his own urine.

112.    Numerous other times, as an end run around their own guidelines, Defendants' staff or their agents placed Q.T. in "quiet rooms" and/or "Resource Suites" and left the door open to avoid documenting his forced isolation as a seclusion, even though Q.T. was prevented from leaving.

113.    Moreover, there were at least approximately 453 instances where Q.T. was removed from his peers, though not placed in an isolated room, in what amounts to a *de facto* seclusion.

114.    Upon information and belief, Defendants failed to use de-escalation strategies or PBIS methods and, in fact, their lack of techniques served to exacerbate Q.T.'s behaviors.

115.    Upon information and belief, Q.T. has been subjected to unlawful restraints and seclusion on hundreds of occasions without appropriate documentation.

116.    Q.T. has been severely harmed by seven years of continuous improper restraint and seclusion.

117.    Q.T. has been fearful to attend school because of Defendants' persistent and unnecessary use of restraint and seclusion.

118.    After enduring repeated instances of restraint and seclusion, Q.T. has experienced regression in activities of daily life.  For example, Q.T. can no longer:

    a.   go into any room with a closed door;

    b.   go to the bathroom by himself and close the door, as he once did, for fear of being in isolation;

    c.   sleep alone in his own room as he once did; and

    d.   shower or bathe unless he knows a parent is nearby.

119.    To this day, Q.T. experiences sleeplessness and nightmares resulting from his forced isolation in Defendants' care and custody.

120.    Until Q.T. was placed in a new school where seclusion is never used and limited forms of standing restraint are only implemented in exceptional circumstances, he was not safe. Although Q.T.'s academic performance has improved since he has transferred to a school that does not use seclusion and strictly limits standing restraints,  there is nothing to prevent his current school from beginning to implement the same pervasive practices utilized throughout the FCPS system or to prevent Defendants from moving him to another school that does.

### A.O. & D.O.

121.    A.O. is an eight-year-old child diagnosed with an emotional disability.  She began attending kindergarten at Fairview Elementary School in the Fall of 2016, when she was five years old.

122.    From the Fall of 2016 through May 2019, A.O. has been restrained and secluded on numerous occasions for reasons that do not pose an imminent threat of harm to herself or others, like hiding in the bathroom from her teachers or not doing her classwork.

123.    In almost all known instances, Defendants failed to provide Ms. Ononiwu with parental notification within 24 hours.

124.    Ms. Ononiwu first learned that A.O. was being restrained when she walked into Fairview Elementary School and witnessed A.O. without shoes, having had her shoes knocked off as she was being dragged down the hall and held down by FCPS personnel for refusing to complete a math worksheet.  Ms. Ononiwu was never provided appropriate documentation or notice of this incident within 24 hours pursuant to *FCPS Guidelines*, or documentation explaining why restraint was used.

125.    In May of 2019, Defendants forced A.O. to attend Burke Alternative Learning Center in lieu of general, inclusive education.

126.    In May of 2019, A.O. experienced emotional trauma from witnessing Defendants' staff use an unwarranted physical chokehold on her classmate.

127.    In that same month at Burke Alternative Learning Center, A.O.'s teacher requested that an SRO take A.O. to a "reflection room" when she was standing near the stairs and not moving back to her classroom.  Upon information and belief, A.O.'s behavior posed no risk of harm to herself or others.  Ms. Ononiwu has never received notification from Defendants related to this incident.

128.    As a result of these experiences, A.O. has experienced increased anxiety, exacerbating her underlying emotional disability, and is terrified to attend school for fear that she will be physically harmed by Defendants' staff and agents.

129.    As a direct and proximate result of Defendants' improper use of restraint and seclusion, A.O. has missed days of school for fear of being injured by Defendants' employees. A.O. experiences trauma in enclosed rooms and cannot be in her own bedroom with the door closed.  A.O. experiences nightmares and is fearful in public settings when she sees individuals resembling FCPS staff.

130.     As a direct and proximate result of Defendants' improper use of restraint and seclusion, A.O. attends ongoing counseling by a clinical psychologist to address the trauma related to Defendants' unlawful actions.

131.     Ms. Ononiwu has since placed A.O. into a private educational setting because of A.O.'s fear of returning to FCPS.  In the short time she has been in a private school, A.O. has improved behaviorally and has had no documented behavioral issues.

132.     D.O., A.O.'s younger brother, began attending Fairview Elementary School in the Fall of 2018 when he was six years old.  D.O. has ADHD and developmental delay.

133.     From the Fall of 2018 through June 2019, D.O. has been restrained and secluded at least four times within four weeks for disability-related needs that do not pose an imminent threat of harm to D.O. or others.  For example, D.O. has been restrained or secluded in instances where he has merely left the classroom without permission.

134.     In one of those four known instances, D.O. was restrained by Defendants' staff for throwing water bottles.  The use of restraint caused D.O.'s behaviors to escalate, which Defendants' staff used as further justification to continuously restrain and seclude him without employing less intrusive interventions.

135.     In another instance, Ms. Ononiwu came to the Fairview Elementary to pick D.O. up for a dentist appointment and witnessed an SRO holding D.O. in a chokehold.  The SRO was bending D.O. at a 90-degree angle while D.O. struggled and stated "let go" multiple times.  Ms. Ononiwu did not receive formal notice within 24 hours pursuant to *FCPS Guidelines* regarding the incident.

136.     When Ms. Ononiwu ultimately received some documentation of the incident— though incomplete and not in accordance with *FCPS Guidelines*—the documents revealed that

D.O. was physically restrained by an SRO for a period of 30 minutes to 1.5 hours.  That SRO later claimed he sustained injuries from holding D.O. for so long and with such force.

137.    Regarding the final of the four known incidents, D.O. was suspended from kindergarten on October 5, 2018 for 10 days.  Eleven days later, it was determined that the conduct for which D.O. had been suspended was a manifestation of his disability-related needs.

138.    Upon information and belief, this restraint took place after an incident in which D.O. threw books on the ground at school or engaged in behaviors that were escalated due to Defendants' attempts to restrain and seclude him.  As with A.O.,

139.    In October 2018, Defendants required D.O. to leave a general education setting at Fairview Elementary School and placed him at Burke Alternative Learning Center.  There, Defendants continued to use unnecessary restraint and seclusion on D.O. without notice to Ms. Ononiwu pursuant to *FCPS Guidelines*.

140.    The last known incident of seclusion of D.O. occurred on March 21, 2019, when D.O. was forced to go to a "reflection room" by a Behavior Intervention Specialist because he laid down on his classroom floor.  Although Ms. Ononiwu asked for information regarding this incident, she was only provided with a general description of what happened after-the-fact and did not receive a timely notice or full report pursuant to *FCPS Guidelines*.

141.    The last known incident of restraint of D.O. occurred on June 6, 2019, while riding the bus home from Burke Alternative Learning Center.  D.O. was restrained for not wanting to sit next to a bus aide.  During that restraint, D.O. was struck in the head by a handheld radio.  D.O. came home with physical injuries and experienced a concussion, headaches, and concentration issues as a result.  Ms. Ononiwu requested documentation regarding this incident from Defendants, but she never received it.

142.    Upon information and belief, as a result of the last incident of restraint, Defendants attempted to require D.O. to wear a "safety vest" when travelling on the bus in anticipation of his potential behaviors and not in response to any current threat to self or others.  Defendants proposed this form of restraint based on their assumption that D.O. has the **potential** to cause harm to himself and others.  Ms. Ononiwu rejected this request as a form of restraint.

143.    Upon information and belief, in lieu of using a vest, Defendants have created a single bus route for D.O. where he is the only child on the bus, thereby creating a *de facto* form of seclusion.

144.    As a result of these experiences, D.O. experiences increased anxiety when he is in a room with a closed door.

### C.T.

145.    C.T. is a ten-year-old boy with autism, sensory processing disorder, anxiety, social and emotional communication delay, and ADHD.  C.T. has attended FCPS since 2014.  He attended Colin Powell Elementary School from 2014 to 2015 and has attended Eagle View Elementary School from 2015 to 2019.

146.    C.T. has been subjected to numerous unnecessary restraints, seclusion, and unlawful seizures from 2015 to 2019, with the last known incident of restraint and seclusion occurring on May 20, 2019, at Eagle View Elementary School.

147.    On May 20, 2019, Ms. Thomas received an e-mail from C.T.'s teacher at Eagle View Elementary School claiming that C.T. was "having a difficult morning" and was "refusing work and ha[d] been stabbing his breakfast container with a pencil."  Ms. Thomas received a second e-mail stating that C.T. was "back on track."

148.    Later, Ms. Thomas received a third e-mail stating that C.T. was "being very confrontational, cussing, and using sexually inappropriate language."  At that point, C.T.'s teacher

40

"requested to put [C.T.] into support," another term for forced seclusion.  C.T.'s teacher reported that, while he was walking C.T. to "support," C.T. commented, "I want to die, can someone just kill me?"

149.    After receiving the third e-mail, Ms. Thomas went directly to Eagle View Elementary School and arrived minutes later.  When she walked into the front door, she heard C.T. screaming, "Somebody help me, please let me out!" from inside a seclusion room.  This was the first Ms. Thomas learned about seclusion rooms in Eagle View Elementary School, let alone that her child had been placed in one.

150.    C.T.'s comment could in no way be interpreted as an imminent threat of harm to himself or others; nor is isolation an appropriate response to such a statement.  Nevertheless, he was restrained and forced into seclusion.

151.    After this incident, C.T. stayed home from school for two days due to his fear and anxiety about returning to the seclusion room.

152.    On May 23, 2019, Ms. Thomas sent an e-mail to C.T.'s teacher requesting documentation relating to this incident; C.T.'s teacher never responded.

153.    C.T. reported to Ms. Thomas that he has been secluded in the past, often for non-dangerous reasons like refusing to do his classwork.  Each time he was secluded, he was also restrained by FCPS staff and/or agents who twisted his arm behind his back and forced him down the hall to the seclusion room.

154.    During C.T.'s four years at Eagle View Elementary School, Ms. Thomas never received any documentation from Defendants relating to restraint or seclusion in accordance with *FCPS Guidelines*.

155.    As a direct and proximate result of Defendants' actions, C.T. has experienced sleepwalking and waking up screaming in terror, yelling that he does "not want to go in there."

**Organizational Plaintiffs**

156.    Organizational Plaintiffs have a shared mission of ending systemic mistreatment of persons with disabilities, including in school.  Each organization includes members with children attending FCPS and/or represents the interests of such persons in its policy, advocacy, and outreach work.  Moreover, Organizational Plaintiffs have diverted significant resources to combat the use unlawful use of restraint and seclusion against students with disabilities.  Thus, Organizational Plaintiffs have both organizational and representational standing through their members who have been unjustifiably restrained and secluded by Defendants.

157.    COPAA brings this suit on behalf of its members and in furtherance of its extensive efforts and expenditure of resources in promoting its principal mission of securing appropriate and equal educational services for students with disabilities.  COPAA members have called for use of positive approaches and limiting restraint and ending seclusion in schools since 2008.  COPAA members are active in educating parents and students about their rights and about dangers of restraint and seclusion; the passage of state level legislation that protects students; and efforts to pass federal legislation that creates uniform protection, recourse and a bright line regarding the imposition of restraint and resulting obligations on school districts.

158.    ASAN has spent numerous hours over the past several years on advocacy to combat seclusion and restraint in schools, in part due to complaints from families such as the Individual Plaintiffs.  ASAN has participated in coalition workgroups to analyze and develop policy measures that would end seclusion and restraint in schools and written comments on federal regulations concerning seclusion and restraint in schools.  It has also met numerous times with federal legislators on proposed or pending legislation concerning restraint and seclusion in schools, which

occupied approximately 80 hours of staff time in the past year and several additional hours of time from volunteers and members.  Moreover, ASAN has spent considerable staff time on resources for publication on policy issues facing the autistic community, including restraint and seclusion in schools.  If not for the numerous complaints from its members and members of the public that it has received on this issue, including complaints from families in FCPS, ASAN would have been able to expend these resources on advocacy around the many other pressing issues affecting the autistic community.  ASAN brings this suit on behalf of its members and in furtherance of its mission to ensure that autistic individuals are safe, are treated equally under the law, are included in mainstream settings, and are provided appropriate education without fear of discrimination.

159.    Communication First serves approximately 5 million children and adults in the United States with expressive speech-related disabilities, either congenital, developmental, or acquired.  It receives calls weekly from individuals who have children with communication-related disabilities and are students that experience unlawful restraint, seclusion, or forced isolation. Communication First uses its resources to respond to these calls and assist these individuals to address problems involving restraint and seclusion, as well as the subsequent mental health and trauma caused by restraint and seclusion.  Communication First works with individuals who have witnessed or been a victim of restraint and seclusion at times in their lives when they had not access to effective communication tools and supports and were unable to report these traumatic experiences to others.  Communication First brings this suit on behalf of its members and in furtherance of its mission to educate the public and advocate for policy reform to advance the rights, autonomy, opportunity, and dignity of people with speech-related communication disabilities and conditions.

**There is no requirement that Plaintiffs exhaust administrative remedies.**

160.    Defendants' response to the media outcry involving its unlawful and unjustified use of restraint and seclusion illustrates why exhaustion is not required in this case.  That Defendants held an emergency meeting and have since created an advisory Task Force to Dr. Brabrand to try and resolve the issues arising from their unlawful practices, establish why the remedies Plaintiffs seek in this lawsuit are unavailable through traditional methods of administrative review and due process under the IDEA because these solutions require systemic planning, funding, and administration that cannot be obtained through that process.  Moreover, remedies through the IDEA administrative process are not available to Organizational Plaintiffs.

161.    Even when exhaustion of administrative remedies is required, exhaustion is excused when: further administrative actions would be futile; an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; Plaintiffs have not received adequate notice to exercise their due process rights; and relief available through additional administrative efforts would be inadequate to address a plaintiff's claims.  All of these exceptions apply to Plaintiffs' claims.

162.    Defendants have consistently failed to provide timely appropriate notice to Individual Plaintiffs' of each instance of restraint and/or seclusion, denying Individual Plaintiffs' their administrative due process rights.

163.    Even if such notice were appropriately given, Defendants' systemic failure to knowingly plan, fund, and administer a system designed to address behavioral issues through effective means, which is the gravamen of this complaint, could not be addressed in a due process proceeding.

164.    Specifically, the lynchpin of Plaintiffs' complaint is Defendants' failure to:

a.  ensure all students with disabilities are provided with basic reasonable accommodations to address their disability-related support needs throughout the day;

b.  provide appropriate training of school district staff;

c.  make available and provide FBAs and BIPs;

d.  proliferate evidence-based supports like a system of PBIS to deescalate their students' behaviors without restraint and seclusion;

e.  provide a sufficient number of qualified staff across FCPS available to implement such positive behavioral support techniques;

f.  establish professional competencies and qualification for such staff;

g.  implement district-wide data collection and reporting on both the use of restraint and seclusion and the implementation of alternative techniques; and

h.  continuously monitor and respond to restraint and seclusion incidents across FCPS.

165.   Defendants' systemic failure to be transparent in their approach to rectify their inappropriate restraint and seclusion practices is contrary to law, places this matter outside the realm of traditional notions of IDEA due process requiring court intervention.

166.   Moreover, individual plaintiffs seek damages and other remedies that are not available under the IDEA.

## CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF TITLE II OF THE ADA
**(on behalf of Individual Plaintiffs and Organizational Plaintiffs)**

167.   Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

168.    Title II of the ADA applies to all services, programs, and activities of public entities, including public educational institutions.

169.    Defendants are, and at all relevant times have been,  public entities covered by Title II of the ADA.

170.    Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

171.    Moreover, the ADA makes it unlawful for a public entity to "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service," or "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service" that is not equal to that afforded to others[.]" *Id.* § 35.130(b)(1)(i)–(ii).

172.    A public entity must not "provide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." *Id.* § 35.130(b)(1)(iii).

173.    A public entity must also "make reasonable modifications" to its services and activities "when the modifications are necessary to avoid discrimination." *Id.* § 35.130(b)(7)(i).

174.    Finally, a public entity must administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. *Id.* § 35.130(d).

175.    Under the ADA, public schools are responsible for the discriminatory actions of school officials, school employees, and everyone over whom a school exercises control, whether through contract or other arrangement, including SROs, whether they are school district employees or work for a non-district law enforcement agency.

176.    Schools cannot divest themselves of responsibility for the nondiscriminatory administration of school policies, including restraint, by relying on SROs, school district police officers, contract or private security companies, security guards, other contractors, or other law enforcement personnel administering school policies.

177.    Public schools are also responsible under the ADA for the discriminatory actions and inaction of their other agents, including private schools in which a public-school district places its students.

178.    Defendants have systemically violated Title II of the ADA by routinely excluding students with disabilities from the benefits and services of a publicly funded educational institution.  By unnecessarily using restraint and seclusion as a disciplinary measure against students with disabilities, Defendants' actions and inaction have culminated in hostile learning environments that deny Plaintiffs the participation in or receipt of benefits, services, or opportunities.

179.    Defendants have treated students with disabilities differently from students without disabilities by placing them in isolation cells in response to insubordination or minor behaviors.

180.    Defendants' disproportionately use restraint and seclusion on students with disabilities as punitive measures.

181.    Defendants fail to train, oversee and hold their employees accountable for such physical and psychological punishments in derogation of *FCPS Guidelines*.

182.    Defendants' abuses are directly and proximately caused by their intentional failure to plan, fund, and administer a system designed to respond to disability-related needs through effective means including:

a.   ensuring all students with disabilities are provided with reasonable modifications to address their disability-related support needs throughout the day;

b.   strictly limiting use of restraint and seclusion on students with disabilities;

c.   appropriate training and oversight of school district staff;

d.   providing FBAs, BIPS, and PBIS services to respond to students' disability-related behaviors without restraint and seclusion;

e.   providing sufficient qualified staff to implement positive behavioral support techniques;

f.   instituting effective and appropriate data collection, reporting, and responses on the use of restraint and seclusion (e.g. the number of incidents, the circumstances, and the duration) and the implementation of alternative techniques; and

g.   monitoring restraint and seclusion incidents across FCPS to ensure they are utilized only when appropriate.

183.    Defendants have failed to provide students with disabilities reasonable accommodations, such as PBIS, and have denied students with disabilities "equal opportunity to obtain" or reach the "same level of achievement as that provided to others" who are not subjected to restraint and seclusion.

184.    Defendants have further violated the ADA and their own guidelines by subjecting students with disabilities, including Plaintiffs, to restraint and seclusion for unnecessary periods of time well after any purported behavioral concerns have been addressed.

185.     Moreover, Defendants' overuse of restraint and seclusion segregates students with disabilities from their classrooms and classmates and, thus, fails to serve them in the most integrated setting appropriate to their needs.  Defendants have failed to timely return Plaintiffs to the learning environment even after they have been unnecessarily restrained or secluded.

186.     Defendants have harmed Organizational Plaintiffs by subjecting their members to the same discriminatory treatment as Plaintiffs.  Defendants have discriminated by virtue of their use of unnecessary restraint and seclusion, thereby frustrating Organizational Plaintiffs' core missions to prevent unlawful restraint and seclusion against students with disabilities.  Defendants' discrimination has caused Organizational Plaintiffs to divert significant resources to combat the unlawful use of restraint and seclusion against students with disabilities.

187.     Defendants have intentionally infringed on the rights of Plaintiffs and/or been indifferent to their rights and the foreseeable harms.

**COUNT II**
**VIOLATIONS OF THE SECTION 504 OF THE REHABILITATION ACT**
**(on behalf of Individual Plaintiffs and Organizational Plaintiffs)**

188.     Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

189.     Defendants are, and at all relevant times have been, recipients of federal funds covered by Section 504.

190.     Under Section 504 and its regulations, 29 U.S.C. § 794, 34 C.F.R. § 104.4(a), no qualified person with a disability shall, on the basis of disability, be excluded form participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which receives federal financial assistance.

191.    Section 504 covers school officials, school employees, and everyone over whom a school exercises control, whether through contract or other arrangement, including SROs, and private schools in which a public-school district places its students.  29 U.S.C. § 794(b)(2)(B).

192.    Defendants have systemically violated Section 504 by disproportionately and unlawfully using restraint and seclusion as a *de facto* punishment against students with disabilities, denying students with disabilities reasonable modifications such as PBIS, and routinely excluding students with disabilities from the benefits and services of a publicly funded educational institution.  Defendants' actions and inaction have culminated in hostile learning environments that deny Plaintiffs the participation in or receipt of benefits, services, or opportunities.

193.    Defendants have harmed Organizational Plaintiffs by subjecting their members to the same discriminatory treatment as Individual Plaintiffs.  Defendants have discriminated by virtue of their use of unnecessary restraint and seclusion, thereby frustrating Organizational Plaintiffs' core missions to prevent unlawful restraint and seclusion against students with disabilities.  Defendants' discrimination has caused Organizational Plaintiffs to divert significant resources to combat the unlawful use of restraint and seclusion against students with disabilities.

194.    Defendants have intentionally infringed on the rights of Plaintiffs and/or been deliberately indifferent to their rights and the foreseeable harms.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983 FOR VIOLATIONS OF THE FOURTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**(on behalf of Individual Plaintiffs and Organizational Plaintiffs)**

195.    Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

196.    Defendants have committed constitutional violations against Plaintiffs under color of law.

50

197.   Under 42 U.S.C. § 1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

198.   Defendants have deprived Plaintiffs of their Fourth and Fourteenth Amendment rights under color of law by subjecting them to unlawful seizures, denying them due process of law, and denying them educational opportunities equal to non-disabled students.

199.   The Fourth Amendment provides the right to be free from "unreasonable searches and seizures[.]"  U.S. Const. amend IV.

200.   Defendants' actions relating to Plaintiffs constitute unlawful seizures that are objectively unreasonable under the circumstances and in light of the educational objectives Defendants purport to be trying to achieve.  Defendants' staff, employees, and contractors are acting under color of law under § 1983 and are directly and proximately responsible for the deprivation of Plaintiffs' Fourth Amendment rights.

201.   The Fourteenth Amendment mandates that all persons born in the United States are entitled to due process before restriction of their liberty, and to equal protection of the laws. U.S. Const. amend XIV.

202.   Under the Fourteenth Amendment, a state entity assumes a duty to provide reasonable care to protect a child with whom it has formed a special relationship, such as a child entrusted in the care of a school system.

203.   The foregoing actions and omissions of Defendants constitute a policy, practice, pattern, and/or custom of discriminating against Plaintiffs in violation of the constitutionally protected liberty and privacy interests.

204.     Defendants' actions have violated Plaintiffs' rights to due process and equal protection by subjecting them to unnecessary and unreasonable restraint and seclusion and by isolating them in seclusion based on their disabilities.  Defendants' restraint and seclusion system lacks transparency and accountability and deprives Plaintiffs of due process, including adequate notice regarding students' unlawful seizures, and denies them equal protection by subjecting Plaintiffs to harsher discipline than for those without disabilities who engage in similar conduct.

205.     Defendants' actions have violated Plaintiffs' right to due process by restricting their liberty through unnecessary restraint and seclusion in non-emergency situations without any process, or even notice to parents.

206.     Defendants acted intentionally or with reckless indifference to the constitutional rights of the Plaintiffs.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request the judgment of the Court against Defendants as follows:

A.     Find and declare that Defendants have discriminated against Individual Plaintiffs and Organizational Plaintiffs on the basis of their disabilities, in violation of Title II of the ADA and Section 504 by excluding them from participation in and denying the benefits of a public education;

B.     Find and declare that Defendants have discriminated against Individual Plaintiffs and Organizational Plaintiffs on the basis of their disabilities, in violation of Title II of the ADA and Section 504 by denying them equal opportunity to participate in the benefits provided by Defendants that are afforded to students without disabilities and by unnecessarily segregating them, depriving them of the most integrated setting appropriate;

C.     Find and declare that Defendants have discriminated against Individual Plaintiffs and Organizational Plaintiffs on the basis of their disabilities, in violation of Title II of the ADA

and Section 504 by failing to provide reasonable modifications in lieu of unlawful restraint and seclusion;

D.      Find and declare that Defendants have violated 41 U.S.C. § 1983 and infringed on Individual Plaintiffs' constitutional rights under the Fourth and Fourteenth Amendments to the United States Constitution by subjecting them to unlawful seizures and denying them due process and equal protection;

E.      Issue a preliminary and permanent injunction directing Defendants to cease and desist from using restraint and seclusion on all students with disabilities in the FCPS system until an appropriate alternative system can be planned, funded, administered, and implemented;

F.      Order Defendants to develop and implement a Response to Intervention Program, to include PBIS and trauma informed practices, positive educational and preventive practices and services, that provides an effective evidence-based district-wide classroom management and behavioral supports system to prevent discrimination against, and unnecessary restraint and seclusion of, students with disabilities;

G.      Order Defendants to hire a qualified consultant(s) to assist Defendants to make structural changes to FCPS' systems to ensure evidence-based interventions, curriculum, and training are used to respond to student disabilities, reduce disparities in the administration of restraint and seclusion, eliminate use of restraint and seclusion as disciplinary or punitive measures, and effectively implement PBIS, including trauma informed practices, positive educational and preventive practices and services, and Restorative Practices, as well as sufficient psychological, speech, and other therapeutic services to meet the needs of students with disabilities;

H.     Order Defendants to hire, train, coach, coordinate, and evaluate sufficient staff and employees on evidence-based practices to avoid restraint and seclusion and to use in its place trauma informed PBIS, including training on the proper application of discipline applied to students with disabilities, including those on autism spectrum and those who have speech and communication-related disabilities;

I.      Order Defendants to develop and implement a process to identify students who are disproportionately subject to disciplinary referrals and set benchmarks for identifying students monthly based on appropriate risk criteria;

J.      Order Defendants to develop and implement mechanisms to conduct FBAs and BIPs for all students who have been subjected to restraint or seclusion and to develop and implement procedures to timely provide FBAs and BIPs in response to any incident of restraint or seclusion, as well as to provide such assessments and plans timely upon request of a parent;

K.     Order Defendants to dedicate sufficient funding to implement the system, provide the needed interventions, and meet the related behavioral and therapeutic needs of students with disabilities;

L.      Order Defendants to monitor, collect data, and review procedures sufficient to evaluate progress and impact of the system and to respond to improper uses of restraint and seclusion;

M.     Order Defendants to designate a qualified responsible FCPS employee within the Superintendent's Office, as well as employees in each region, to oversee implementation, compliance, monitoring, and reporting on the system;

N.      Order Defendants to provide dedicated therapy and counseling services to all students with disabilities who have been traumatized by Defendants use of restraint and seclusion, including Individual Plaintiffs' children and members of Organizational Plaintiffs;

O.      Order Defendants to provide training to their employees and staff on the anti-retaliation provisions of federal and state law as they apply to students, parents or third parties, including school personnel who engage in protected activity of reporting, assisting or testifying on behalf of students subject to improper seclusion, restraint or improper physical conduct;

P.      Order Defendants to revise their policies and Code of Conduct to incorporate developmentally appropriate prevention and intervention strategies for each disciplinary tier and requirements for communication with parents to address infractions and assist with transition back to the school and/or classroom environment in the event the child is subject to exclusionary discipline;

Q.      Order Defendants to conduct a review of their records and submit revised reports to the Federal government regarding the incidences of restraint and seclusion since 2009, including disaggregated data in accordance with the Federal government's requirements that such data be submitted to reflect the total number of students subjected to restraint or seclusion by race/ethnicity, sex, limited English proficiency status, and disability;

R.      Order Defendants to appoint an intervention coordinator who is qualified to manage the development and implementation of the Intervention Program, develop policies and intervention documents (including FBAs, BIPs, and Crisis Plans) to assist Defendants' staff in appropriately and effectively managing student misbehavior, ensure that FBAs, BIPs, and Crisis Plans are completed when required, and to carry out all other responsibilities related to the Intervention Program;

S.       Order Defendants to develop and implement a system to provide timely notice of

incidences of restraint and seclusion to parents as required by law;

T.       Award Plaintiffs compensatory damages;

U.       Award Plaintiffs reasonable attorneys' fees and costs, including litigation expenses,

as provided by law; and

V.       Grant such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby request a jury trial.

Respectfully submitted,

/s/ Kevin Byrnes
Kevin E. Byrnes, VSB No. 47623
Fluet Huber + Hoang, PLLC
1751 Pinnacle Drive
10th Floor
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fhhfirm.com

Regina Kline (*pro hac vice pending*)
Eve L. Hill (*pro hac vice pending*)
Sharon Krevor-Weisbaum (*pro hac vice pending*)
Anthony J. May (*pro hac vice pending*)
BROWN, GOLDSTEIN & LEVY, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
T: (410) 962-1030
F: (410) 385-0869
RKline@browngold.com
EHill@browngold.com
SKW@browngold.com
AMay@browngold.com

*Counsel for Plaintiffs*

Dated: October 8, 2019