IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

Q.T., *et al.*,                                    )
                                                   )
      Plaintiffs,                        )
                                                   )
      v.                                 )     Civil Action No. 1:19-cv-01285 (RDA/JFA)
                                                   )
FAIRFAX COUNTY SCHOOL BOARD,                       )
*et al.,*                                          )
                                                   )
      Defendants.                        )

## **ORDER**

This matter comes before the Court on the Motion to Dismiss ("Motion") (Dkt. 18) filed

by Defendants Fairfax County School Board, Dr. Scott Brabrand, and Teresa Johnson

(collectively, "Defendants"). Considering the Amended Complaint (Dkt. 17); the Motion;

Defendants' Memorandum in Support of the Motion (Dkt. 19); the Opposition to the Motion (Dkt.

24) filed by Plaintiffs Q.T., A.O., D.O., C.T., J.M., J.R., Council of Parent Attorneys and

Advocates, Autistic Self Advocacy Network, and Communication First (collectively, "Plaintiffs");

the Defendants' Reply in Support of the Motion ("Reply") (Dkt. 25), the Plaintiffs' Notice of

Supplemental Authority in Opposition to Defendants' Motion to Dismiss ("Plaintiffs'

Supplemental Authority") (Dkt. 31); and Defendants' Response to Plaintiffs' Supplemental

Authority ("Defendants' Supplemental Authority") (Dkt. 32), it is hereby ORDERED that the

Motion is GRANTED in part and DENIED in part for the reasons set forth below.

I.   BACKGROUND

A.   Factual Background

Plaintiffs Q.T., A.O., D.O., C.T., J.M., and J.R. (collectively, "Individual Plaintiffs") are

minor children with disabilities. The Individual Plaintiffs are joined in this suit by Plaintiffs

Council of Parent Attorneys and Advocates ("COPAA"), Autistic Self Advocacy Network ("ASAN"), and Communication First (collectively, "Organizational Plaintiffs"). Dkt. 17, 1.

Plaintiff COPAA is an organization comprised of parents whose children have disabilities, their attorneys, and their advocates. Dkt. 17, ¶ 34. Plaintiff COPAA's mission is to ensure that children receive "appropriate educational services . . . in accordance with federal law." *Id*. Although Plaintiff COPAA is a national not-for-profit organization, Plaintiff COPAA has members that are residents of Fairfax County, Virginia. *Id*.

Plaintiff ASAN is an organization that "seeks to advance the principles of the disability rights movement with regard to autism." *Id*. at ¶ 35. Plaintiff "ASAN's members and supporters include autistic adults and youth, cross-disability advocates, and non-autistic family members, professionals, educators, and friends." *Id*. Some of Plaintiff ASAN's members live in Fairfax County, Virginia. *Id*.

Plaintiff Communication First in a not-for-profit organization whose mission is to "educat[e] the public, advocate[e] for policy reform, and engag[e] the judicial system to advance the rights, autonomy, opportunity, and dignity of people with speech-related communication disabilities and conditions . . . ." *Id*. at ¶ 36. Part of this mission is to "advocate[ ] for students who are unable to reply on speech . . . ." *Id*. Based on Plaintiffs' Amended Complaint, it is unclear whether Plaintiff Communication First has members who live in Virginia or, more specifically, Fairfax County, Virginia.

Defendants are the Fairfax County School Board, Dr. Scott Brabrand, the Superintendent of the Fairfax County Public Schools ("FCPS"), and Teresa Johnson, the Assistant Superintendent for FCPS' Department of Special Services. *Id.* at ¶ 37-39.

Together, the Individual and Organizational Plaintiffs allege that Defendants "improperly and repeatedly physically restrained and secluded" the Individual Plaintiffs and members of the Organizational Plaintiffs. *Id*. at ¶ 1. Plaintiffs contend that by doing so, Defendants have "violate[d] state[1] and federal law, Defendants' own stated guidelines, and evidence-based practices on how to address students with disabilities." *Id*. at ¶ 3. The following facts are set forth in the Plaintiffs' Amended Complaint. *See generally* Dkt. 17.

Plaintiffs define the terms "physical restraint" and "seclusion" by citing to the definition provided by the United States Department of Education ("U.S. DOE") Office for Civil Rights ("OCR"). *Id*. at ¶ 40. Plaintiffs set forth that the U.S. DOE's OCR defines "physical restraint" as "a 'personal restriction that immobilizes or reduces the ability of a student to move his or her torso, arms, legs, or head freely.'" *Id*. (citing U.S. Dep't of Ed., *Restraint and Seclusion: Resource Document* 10 (May 2012), https://www2.ed.gov/policy/seclusion/restrains-and-seclusion-resources.pdf). U.S. DOE's OCR defines "seclusion" as "[t]he involuntary confinement of a student alone in a room or area from which the student is physically prevented from leaving." *Id*.

In 2012, Defendant devised and implemented the *Guidelines on the Use of Physical Restraint and Seclusion for Students with Disabilities Receiving Special Education Services* ("2012 Guidelines"). Dkt. 17, ¶ 68 (citing Fairfax Cnty. Pub. Schs., *Guidelines on the Use of Physical Restraint and Seclusion for Students with Disabilities Receiving Special Education Services* (Mar. 2012), https://www.fcps.edu/sites/default/files/media/pdf/PhysicalRestraintSeclusion.pdf). Plaintiffs provide that the 2012 Guidelines include the following provisions:

> School personnel bear the responsibility of safeguarding th[e] right [to be treated with dignity and respect] and ensuring that the learning environment remains safe

---

[1] Plaintiffs' Amended Complaint does not set forth a distinct count alleging violation of a state law. *See generally*, Dkt. 17.

and supportive.  The right to be educated in a safe and supportive climate of success extends to all students at all times, in all school environments.

* * *

When managing student behavior, physical restraint and seclusion are safety procedures used when less restrictive alternatives have failed and the student is an immediate danger to him or herself and/or others.  The use of abusive or aversive interventions, including corporal punishment, is expressly prohibited.

* * *

Each principal or program administrator will determine a time and method to ensure that appropriate staff members, parents, and students are familiar with the school division's policies and procedures regarding the use of behavior management techniques, physical restraint, and seclusion in dangerous situations.

*Id*.  Plaintiffs contend that "[d]espite [ ] [Defendants'] own guidelines, Defendants have, for years, allowed their employees and agents to restrain and seclude children with disabilities without requiring them to exhaust the use of less restrictive measures and accommodations."  Dkt. 17, ¶ 84.

More specifically, the Individual Plaintiffs have each alleged that they were subjected to the following instances of restraint and seclusion at the hands of Defendants' employees and agents.

### i.  Plaintiff Q.T.

Plaintiff Q.T. is a thirteen-year-old child and is a "non-verbal student with autism."  *Id*.  ¶ 116.  Plaintiffs contend that from 2011 to 2018, when Q.T. was five to 12 years of age, Q.T. "was restrained and secluded at least approximately 745 documented times by Defendants' staff or their agents."  *Id*.  422 of these occurrences took place in a "general education setting."  *Id*. at ¶ 117.  323 of these instances took place "after Q.T. was moved at FCPS' insistence and cost, into a private contract facility."  *Id*.  On each of the 745 instances, Plaintiffs contend, Plaintiff Q.T. "was first

physically restrained in the classroom and then placed in a six-by-six-foot padded room with a magnetically locked door, where he was left in isolation." *Id*. at ¶ 118.

One such example occurred while Plaintiff Q.T. was attending the school "Kennedy Krieger."[2] *Id*. at ¶ 119. There, he was placed in a "solitary isolated room where he received instruction alone without any other children present." *Id*. Plaintiffs contend that Plaintiff Q.T. was only permitted to leave the isolation room to use the restroom. *Id*. Plaintiffs further maintain that Plaintiff "Q.T. spent two consecutive months in 'exclusion[,]'" and "[t]he only way he was permitted to leave was to earn his way back out through what Defendants' deemed to be good behavior for three consecutive days." *Id*.

Further, Plaintiffs allege, Plaintiff "Q.T. was regularly secluded for reasons that did not pose an imminent threat to himself or others . . . ." *Id*. at ¶ 123. One instance of this was when he was "secluded after exhibiting escalating behaviors that initially arose from throwing his headphones in a toilet." *Id*. In some instances, when Plaintiff Q.T. was secluded he "soiled himself until released." *Id*. at ¶ 125.

In addition to these 745 instances, Plaintiffs contend that "[n]umerous other times . . . Defendants' staff or their agents placed [Plaintiff] Q.T. in 'quiet rooms' and/or 'Resource Suites' and left the door open . . . even though Q.T. was prevented from leaving." *Id*. at ¶ 126. Further, Plaintiffs plead that "there were at least approximately 453 instances where [Plaintiff] Q.T. was removed from his peers, though not placed in an isolated room, in what amount[ed] to [ ] *de facto* seclusion." *Id*. at ¶ 127. And, what is more, Plaintiffs believe that Plaintiff Q.T. was "subjected

_____

[2] According to Plaintiffs, Kennedy Kreiger School is a school in "Silver Spring, Maryland, which was under contract with Defendants and, at all relevant times, acted as an agent of Defendants." *Id*. at ¶ 120.

to unlawful restraints and seclusion on hundreds of occasions without appropriate documentation." *Id.* at ¶ 129.

## ii. Plaintiff A.O.

Plaintiffs also allege that Plaintiff A.O. was subjected to instances of restraint and seclusion by Defendants' staff and employees. Plaintiff A.O. is now eight years old and she has been "diagnosed with an emotional disability." *Id.* at ¶ 135. In the fall of 2016, at the age of five, Plaintiff A.O. started kindergarten at Fairview Elementary School.[3] Plaintiffs contend that "[f]rom [f]all of 2016 through May [of] 2019, [Plaintiff] A.O. ha[d] been restrained and secluded on numerous occasions . . . ." *Id.* at ¶ 136. "In almost all known instances" Defendants did not provide "Ms. Ononiwu"[4] with parental notification within 24 hours. *Id.* at ¶ 137.

Ms. Ononiwu found out that Plaintiff A.O. was being restrained when she came to Fairview Elementary School and saw Plaintiff A.O. being "dragged down the hall[,]" "held down by FCPS personnel[,]" and "without shoes[.]" *Id.* at ¶ 138. Plaintiffs assert that Plaintiff A.O. was so restrained because she refused to complete a math worksheet. *Id.*

Then, in May of 2019, Defendants' employees allegedly "forced [Plaintiff] A.O. to attend Burke Alternative Learning Center in lieu of general, inclusive education."[5] *Id.* at ¶ 140. There,

---

[3] Though Plaintiffs' Amended Complaint does not specify whether the Fairview Elementary School that Plaintiff A.O. attended is within FCPS, the Court presumes that it is, as there appears to be a Fairview Elementary School within FCPS. *See* Fairfax County Public Schools, Fairview Elementary School, https://fairviewes.fcps.edu/ (last visited June 8, 2020).

[4] Although not specified in the Amended Complaint, the Court presumes that "Ms. Ononiwu" is Plaintiff A.O's mother.

[5] Though Plaintiffs' Amended Complaint does not specify whether the Burke Alternative Learning Center that Plaintiff A.O. attended is within FCPS, the Court surmises that it is, as there appears to be a Burke Alternative Learning Center within FCPS. *See* Fairfax County Public Schools, Burke Alternative Learning Center, https://www.fcps.edu/school-center/burke-alternative-learning-center (last visited June 8, 2020).

and in the same month, Plaintiff A.O. was placed in "a 'reflection room'" after she "st[ood] near the stairs and [did] not mov[e] back to her classroom." *Id*. at ¶ 142.

### iii. *Plaintiff D.O.*

Plaintiffs plead that Plaintiff D.O., who is Plaintiff A.O.'s younger brother, has also been restrained and secluded while attending schools within FCPS. Plaintiff D.O. "has ADHD and developmental delay." *Id*. at ¶ 147. In the fall of 2018, when Plaintiff D.O. was six years of age, he began attending Fairview Elementary School. *Id*.

"From the [f]all of 2018 through June [of] 2019, [Plaintiff] D.O. ha[d] been restrained and secluded at least four times within four weeks for disability-related needs . . . ." *Id*. at ¶ 148. According to Plaintiffs, Plaintiff D.O. has been restrained and secluded "in instances where he has merely left the classroom without permission." *Id*. He was also so restrained and secluded for "throwing water bottles." *Id*. at ¶ 149. Further, there was an instance where Ms. Onowinu came to Fairview Elementary School, and "witnessed . . . [Plaintiff] D.O. [being held] in a chokehold." *Id*. at ¶ 150. The individual that was so holding Plaintiff D.O. "was bending [ ] [him] at a 90-degree angle while [Plaintiff] D.O. struggled and stated 'let go' multiple times." *Id*. The documentation that Ms. Ononiwu received concerning that incident indicated that on that occasion, Plaintiff D.O. was restrained for a period of "30 minutes to 1.5 hours." *Id*. at ¶ 151. The individual that restrained Plaintiff D.O. indicated that "he sustained injuries from holding [Plaintiff] D.O. for so long and with such force." *Id*.

Plaintiffs also maintain that when on October 5, 2018, Plaintiff D.O. was suspended from kindergarten, it was due to a "manifestation of [ ] [Plaintiff D.O.'s] disability-related needs." *Id*. at ¶ 152. Plaintiffs contend that Plaintiff D.O.'s suspension followed an incident where he "threw

books on the ground at school or engaged in behaviors that were escalated due to Defendants' attempts to restrain and seclude him." *Id*. at ¶ 153.

In October of 2018, Defendants "required" Plaintiff D.O. to leave Fairview Elementary School, and placed Plaintiff D.O. at Burke Alternative Learning Center, where Plaintiff D.O. continued to be subjected to "unnecessary restraint and seclusion." *Id*. at ¶ 154. Plaintiffs assert that on March 21, 2019, Plaintiff D.O. was "forced to go to a 'reflection room' . . . because he laid down on his classroom floor." *Id*. at ¶ 155. Also, on June 6, 2019, "while riding the bus home from Burke Alternative Learning Center[ ][,] [Plaintiff] D.O. was restrained for not wanting to sit next to a bus aid." *Id*. at ¶ 156. During this June 6, 2019 instance of restraint, Plaintiff D.O. was "struck in the head by a handheld radio[ ]" from which he sustained physical injuries consisting of "a concussion, headaches, and concentration issues." *Id*.

Following the incident, Defendants allegedly attempted to require Plaintiff D.O. to wear a "safety vest." *Id*. at ¶ 158. When Ms. Ononiwu rejected this request, Defendants "created a single bus route for [Plaintiff] D.O." in which Plaintiff D.O. "[was] the only child on the bus[.]" *Id*.

Further, on December 12, 2019, when it was time for Plaintiff D.O. to proceed to another teacher's classroom, Plaintiff D.O. declined to do so. *Id*. at ¶¶ 160-162. Though he was told to leave, Plaintiff D.O. remained, stood by the teacher and another student who were trying to complete the lesson, and laid on the table where the teacher and the other student had been working. *Id*. at ¶ 161. Apparently, these actions required the teacher to push the classroom "panic button." *Id*. at ¶ 162. After the teacher pushed the button, a staff member and the school's Interim Assistant Principal entered the classroom. *Id*. The staff member "grabbed [Plaintiff] D.O.'s right arm, leaving three documented bruises and scrapes as [the staff member] tried to restrain and physically remove [Plaintiff] D.O. from the classroom." *Id*. Further Plaintiff D.O. "began

bleeding as a result of the [ ] restraint," requiring "the school nurse to clean the wounds and provide [ ] [Plaintiff D.O.] with bandages." *Id.*

### iv. Plaintiff C.T.

Additionally, Plaintiffs allege that Plaintiff C.T. has been detained and secluded at FCPS. Plaintiff C.T. is a ten-year-old boy who is autistic and has "sensory processing disorder, anxiety, social and emotional communication delay, and ADHD." *Id.* at ¶ 167. Plaintiff C.T. has attended FCPS since 2014. *Id.* From 2014 to 2015, he attended Colin Powell Elementary School, and from 2015 to 2019, he attended Eagle View Elementary School. *Id.* He currently attends Burke Alternative Learning Center.[6] *Id.*

According to Plaintiffs, during the time that he has attended FCPS, Plaintiff C.T. "ha[d] been subjected to numerous unnecessary restraints, seclusion, and unlawful seizures[.]" *Id.* at ¶ 168. One of these alleged instances occurred on May 20, 2019. *Id.* at ¶ 169. That day, "Ms. Thomas"[7] received an email from one of Plaintiff C.T.'s teachers, which indicated that Plaintiff C.T. was "having a difficult morning" and "refus[ed] work and had been stabbing his breakfast container with a pencil." *Id.* That same morning, Ms. Thomas received another email which indicated that Plaintiff C.T. was then "back on track." *Id.*

Again, that morning, Ms. Thomas received a third email which provided that Plaintiff C.T. was then "being very confrontational cussing, and using sexually inappropriate language." *Id.* at ¶ 170. The teacher asked to "put [Plaintiff C.T.] into support," which Plaintiffs allege was "another

---

[6] Though Plaintiffs' Amended Complaint does not specify whether the Burke Alternative Learning Center that Plaintiff C.T. attended is within FCPS, the Court surmises that it is, as there appears to be a Burke Alternative Learning Center within FCPS. *See* Fairfax County Public Schools, Burke Alternative Learning Center, https://www.fcps.edu/school-center/burke-alternative-learning-center (last visited June 8, 2020).

[7] The Court surmises that "Ms. Thomas" is Plaintiff C.T.'s mother, though this fact is not explicitly provided in the Amended Complaint.

term for forced seclusion." *Id.* In the email, the teacher further noted that when he walked Plaintiff C.T. to "support," the teacher observed Plaintiff C.T. say that he "want[ed] to die" and requested that someone "kill [ ] [him][.]" *Id.*

After receiving the third email, Ms. Thomas went directly to Plaintiff C.T.'s school. *Id.* at ¶ 171. Upon arrival, Ms. Thomas heard Plaintiff C.T. scream, "[s]omebody help me, please let me out!" *Id.* Plaintiffs contend that Plaintiff C.T. screamed this from inside a "seclusion room." *Id.* This instance was when Ms. Thomas first learned about the seclusion rooms at Eagle View Elementary School, and that Plaintiff C.T. had been placed in one. *Id.* However, Plaintiff C.T. "reported to Ms. Thomas that he ha[d] been secluded in the past, often for non-dangerous reasons like refusing to do his classwork." *Id.* at ¶ 175. Plaintiff C.T. further indicated to Ms. Thomas that "[e]ach time he was secluded, he was also restrained by FCPS staff and/or agents who twisted his arm behind his back and forced him down the hall to the seclusion room." *Id.*

Further, on October 4, 2019, while attending Burke Learning Center, Ms. Thomas received a phone call from a FCPS staff member indicating that Plaintiff C.T. "had been restrained earlier that day." *Id.* ¶ 177.

### *v. Plaintiff J.M.*

Plaintiffs contend that Plaintiff J.M. was also unlawfully restrained and secluded. Plaintiff J.M. is now six years of age. *Id.* at ¶ 182. He is autistic and also has "fragile X Syndrome, intellectual disability, seizure disorder, ADHD, hypotonia, and anxiety disorder." *Id.* Plaintiff J.M. is "nonverbal and uses an augmentative alternative communication device." *Id.* Since 2018, Plaintiff J.M. has attended FCPS. *Id.* From 2018 to 2019, he attended Louise Archer Elementary School, and he currently attends Alternative Paths Training School, "a private facility, pursuant to an agreement with and paid for by FCPS." *Id.*

According to Plaintiffs, during the 2018-2019 school year alone, Plaintiff J.M. was secluded a minimum of 326 documented times, over the course of 62 school days. *Id*. at ¶ 183. These 326 instances of seclusion totaled 28.9 hours. *Id*. 244 of the 326 instances of seclusion alleged occurred when Plaintiff J.M. was just five years of age. *Id*.

In August 2018, when Plaintiff J.M. began attending the Louise Archer Elementary School, he was placed in an "enhanced autistic program[,]" and he "adjusted well to the new environment." *Id*. at ¶ 185. However, in "later September [of] 2018," Ms. Mills[8] received notification from one of the FCPS' staff that Plaintiff J.M. was "engaging in purportedly self-injurious behavior, for example, banging his head against the floor." *Id*. at ¶ 186. Further, on October 2, 2018, Plaintiff J.M. "sustained an injury to his head as a result of banging his head on the classroom floor." *Id*. at ¶ 188.

Ms. Mills was then told by FCPS staff that they needed to "create a 'calm area'" in Plaintiff J.M.'s classroom in which FCPS staff would place Plaintiff J.M. *Id*. at ¶ 189. The calm area "consisted of several blue gym mats configured in the shape of a box with the option of leaving the calm area 'closed,' i.e., with four mats standing upright surrounding [Plaintiff J.M.] on all sides, or 'open,' i.e., with only three mats standing upright around [Plaintiff J.M.]" *Id*. at ¶ 190. After the calm area was implemented, there were times where, instead of "closing" the door, FCPS staff would "stand in front of the opening or place pillows down to prevent [Plaintiff] J.M. from leaving." *Id*. As of October 4, 2018, FCPS allegedly placed Plaintiff J.M. in the calm area "on a daily basis." *Id*. at ¶ 191. Moreover, Plaintiffs allege that "[i]n order to place [Plaintiff] J.M. in the calm area, FCPS staffed used physical force to seize and move him to the area." *Id*. at ¶ 193. While in the calm area, sometimes FCPS took Plaintiff J.M.'s communication device from him.

---

[8] The Court surmises that Ms. Mills is Plaintiff J.M.'s mother.

*Id.* at ¶ 201. Plaintiffs attest that "[a]t times and in order to escape seclusion, [Plaintiff] J.M. stripped naked and soiled inside the calm area." *Id.* at ¶ 202. Plaintiffs further contend that in instances when Plaintiff J.M. did so, "FCPS staff forced him to walk across the classroom in the nude before handing him another pair of clothes at his desk." *Id.* at ¶ 202.

Plaintiffs also plead that "[i]n addition to the nearly 29 hours [Plaintiff] J.M. spent in seclusion over 62 school days, [Plaintiff] J.M. spent more than 41 documented hours in the calm area that FCPS staff did not consider to be seclusion." *Id.* at ¶ 200.

When Ms. Mills asked FCPS to stop any use of seclusion, FCPS' staff allegedly denied her request. *Id.* at ¶ 204. FCPS' staff then told Ms. Mills that "the only alternative for [Plaintiff] J.M. would be to place him at Kilmer Alternative Learning Center," which Plaintiffs indicate is a "segregated school for only children with disabilities." *Id.* at ¶ 207. After Kilmer Alternative School was suggested to Ms. Mills, she toured the school and asked whether children there were secluded on a daily basis. *Id.* at ¶ 208. FCPS' staff told her that children were so secluded. *Id.* After having been informed of this, she emailed a FCPS representative to explain to that individual why Kilmer Alternative School was inappropriate to suit Plaintiff J.M.'s needs. *Id.* at ¶ 209. The FCPS' staff then indicated to Ms. Mills that "Kilmer was the only option available for [Plaintiff] J.M. and that it was the most appropriate placement for him." *Id.*

In March of 2019, Ms. Mills removed Plaintiff J.M. from FCPS. *Id.* at ¶ 210. Two months later, Plaintiff J.M. began receiving "homebound services" from FCPS, after Plaintiff J.M.'s doctor concluded that Plaintiff J.M. was "unable to attend school until FCPS found him a proper placement." *Id.*

On April 20, 2019, Ms. Mills spoke with the FCPS Advisory Committee for Students with Disabilities ("ACSD"). *Id.* at ¶ 211. There, she discussed Plaintiff J.M.'s "treatment and her

decision to remove him from FCPS in lieu of attending Kilmer." *Id*.  After the meeting Defendant Brabrand told Ms. Mills that he "wanted to 'make it right.'" *Id*. at ¶ 212.  Ultimately, Plaintiff J.M. was placed at Alternative Paths Training School "pursuant to an agreement with FCPS." *Id*. at ¶ 213.

### vi.  Plaintiff J.R.

Finally, Plaintiffs contend that Plaintiff J.R. has been subjected to unlawful restraint and seclusion during his tenure as a student in FCPS.  Plaintiff J.R. is an eight-year-old boy who "has an emotional disorder, sensory integration dysfunction, and PTSD." *Id*. at ¶ 215.  He has been a FCPS student since August of 2016. *Id*.  From the fall of 2016 to the spring of 2017, he attended Groveton Elementary School; from the spring of 2017 to March of 2019, he attended Hollin Meadows Elementary School; and from March of 2019 until now, he has attended Woodlawn Elementary School. *Id*.

Plaintiffs maintain that "[w]hile attending Groveton as a kindergartener, [Plaintiff] J.R. was consistently bullied by both students and FCPS staff." *Id*. at ¶ 216.  Plaintiffs indicate that an example of such is that after his first day of school at Groveton Elementary School, Plaintiff J.R. told his parents that he was "yelled at by a teacher and came home with bite marks from other students." *Id*.  Plaintiff J.R. further provided that "[w]hen [he] would run from his classroom to escape his classmates, FCPS staff threatened to call the police." *Id*.  As such, Plaintiffs allege, Plaintiff J.R. grew fearful of the school's principal and staff and ran away from them. *Id*.  In response, the FCPS staff began restraining Plaintiff J.R. *Id*. at ¶ 217.  Plaintiffs contend that although Mr. and Mrs. Roby[9] did not receive notice of any such restraint, they did get calls from

---

[9] The Court surmises that "Mr. and Mrs. Roby" are Plaintiff J.R.'s parents.

FCPS staff nearly "every day" indicating that Plaintiff J.R. was "having behavior issues." *Id*.

When Mr. and Mrs. Roby learned that Plaintiff J.R. was being restrained, they contacted the school's principal. *Id*. at ¶ 218. The principal, in turn, informed Mr. and Mrs. Roby that "nothing could be done and claimed that [Plaintiff] J.R. had behavioral issues." *Id*.

Mr. and Mrs. Roby then contacted Assistant Superintendent Terry Dade,[10] who told them that "FCPS could not assist [Plaintiff] J.R. until an IEP was created."[11] *Id*. at ¶ 219. Simultaneously, Assistant Superintendent Dade allegedly "went to Groveton and created a small seclusion area where [Plaintiff] J.R. could be kept away from the general education setting." *Id*.

In May of 2017, after FCPS developed an IEP for Plaintiff J.R., "FCPS agreed to transfer [Plaintiff] J.R. to Hollin Meadows Elementary School." *Id*. at ¶ 220. Plaintiffs describe Hollin Meadows Elementary School as a "Comprehensive Services Site." *Id*. at ¶ 221. Yet, this transfer was allegedly "contingent on Mr. and Mrs. Roby's written consent that restraint and seclusion could be used in extreme cases pursuant to FCPS Guidelines." *Id*. at ¶ 220.

In August of 2017, Plaintiff J.R. was enrolled at Hollin Meadows Elementary School. *Id*. at ¶ 222. Plaintiffs indicate that at Hollin Meadows Elementary School, "there is a 'support room,' which is a large, windowless room with padding and a door that does not lock." *Id*. at ¶ 223. Additionally, "[t]here is [ ] a seclusion room, which is a smaller room located inside of the support room[.]" *Id*. Plaintiffs describe the seclusion room as being "akin to solitary confinement." *Id*. In order to keep students from leaving the seclusion room, a "FCPS staff member must stand outside of the door to the [ ] room and hold a key in a lock[.]" *Id*.

---

[10] To be sure, Assistant Superintendent Terry Dade is not a party to this lawsuit.

[11] Though not explicitly defined in the Amended Complaint, the Court surmises that the "IEP" to which the Plaintiffs refer, is an Individualized Education Program.

Plaintiffs contend that "[f]rom the spring of 2017 through March [of] 2019[,] while at Hollin Meadows, [Plaintiff] J.R. reported to Mr. and Mrs. Roby that he was restrained and secluded – i.e., placed in either the outer support room or inner seclusion room – 4 to 5 days a week." *Id.* at ¶ 224. Plaintiffs further maintain that Plaintiff J.R. was so placed because he was "'disruptive' or ran out of the classroom." *Id.* Additionally, Plaintiffs plead that "[o]n numerous occasions, FCPS staff would grab [Plaintiff J.R. by] his arm, force him down the hall, and place him in those rooms." *Id.* at ¶ 225. Plaintiffs allege that Plaintiff J.R. was placed in the seclusion and support rooms for periods longer than six minutes. *Id.* at ¶ 226.

Additionally, Plaintiffs assert that FCPS staff asked Mr. and Mrs. Roby whether they could place Plaintiff J.R. in a "safety vest" when he travelled to school via school bus. *Id.* at ¶ 230. Mr. and Mrs. Roby did not permit FCPS staff to do so. *Id.* Further, when "Mr. and Mrs. Roby told FCPS staff on multiple occasions that they did not consent to [Plaintiff] J.R. being restrained or secluded[,] FCPS staff ignored their instructions." *Id.* at ¶ 233.

In February 2019, Mr. and Mrs. Roby "notified FCPS that they did not consent to the use of restraint and seclusion on their child or to his removal from instructional settings[,]" and asked that Plaintiff J.R. "be removed from the Comprehensive Services Site classroom at Hollin Meadows[.]" *Id.* Mr. and Mrs. Roby informed FCPS that they believed "this environment [at Hollin Meadows] was toxic and did not meet [Plaintiff J.R.'s] unique needs." *Id.* FCPS then transferred Plaintiff J.R. to Woodlawn Elementary, which Plaintiffs describe as "another Comprehensive Services Site[.]" *Id.* at ¶ 234.

After he began attending Woodlawn Elementary on March 25, 2019, Plaintiff J.R. learned that the school also used a seclusion room despite Mr. and Mrs. Roby previously expressing their concerns about the use of such rooms. *Id.* at ¶¶ 235-36. Mr. and Mrs. Roby "offered to have J.R.'s

therapist, a trauma specialist, consult with FCPS, as it appeared [to them] that FCPS staff had not received appropriate training to handle [ ] [Plaintiff J.R.'s] needs." *Id*. at ¶ 237. FCPS declined this offer. *Id*. Instead, "FCPS staff created a 'safe space' in [Plaintiff] J.R's classroom" for Plaintiff J.R. *Id*. at ¶ 238. The Plaintiffs describe the "safe space" as a "carboard box." *Id*.

Plaintiffs also note that Plaintiff J.R. was secluded in the following instances. "On September 17, 2019, [Plaintiff] J.R. was placed in seclusion for 5 minutes after he stepped out of line and walked ahead of a teacher." *Id*. at ¶ 240. "On September 30, 2019, [Plaintiff] J.R. was again placed in seclusion after he got upset during gym class and left the gym to return to his safe space in his classroom." *Id*. at ¶ 241. Once in the safe space, one of the school's assistant principals told him to take his "safe space" and go to the seclusion room. *Id*. When Plaintiff J.R. did not act accordingly, the assistant principal allegedly "grabbed him by his leg, pulled him out of the classroom, and forced him down the hall into the seclusion room while [Plaintiff] J.R. clutched his box." *Id*. After Mr. and Mrs. Roby requested information concerning this September 30, 2019 incident, FCPS ultimately informed them that it had "completed looking into the incident on September 30, 2019, and based on the information form the three adults involved, there was no physical restraint/engagement or seclusion as it is defined by Fairfax County Public Schools." *Id*. at ¶ 243.

Also, on October 23, 2019, Plaintiff J.R. was "escorted to a seclusion room where he was placed in a room alone with a closed door" in an effort to give him a "break." *Id*. at ¶ 245.

### B. Procedural Background

On October 8, 2019, Plaintiffs filed their Complaint in this Court alleging that Defendants violated Title II of the ADA, Dkt. 1 ¶¶ 167-87, ("Count One"); Section 504 of the Rehabilitation

Act, *Id.* at ¶¶ 188-94, ("Count Two"); and 42 U.S.C. § 1983 for violations of the Fourth and Fourteenth Amendments to the United States Constitution, *Id.* at ¶¶ 195-206, ("Count Three").

On December 13, 2019, Plaintiffs filed an Amended Complaint, which alleged the same violations. Dkt. 17, ¶¶ 262-305. Defendants, on January 13, 2020, filed the instant Motion arguing that the Court lacks subject matter jurisdiction over Plaintiffs' claims and that Plaintiffs have failed to state a plausible claim from which relief may be granted. On February 12, 2020, Plaintiffs opposed the Motion. Dkt. 24. On February 21, 2020, Defendants replied. Dkt. 25.

This Court dispenses with oral argument as it finds that it would not aid in the decisional process. Fed. R. Civ. P. 78; Local Civil Rule 7(J). This matter is now ripe for disposition.

## II. STANDARD OF REVIEW

### A. Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move for dismissal when the court lacks jurisdiction over the subject matter of the action. Fed. R. Civ. P. 12(b)(1). A district court must dismiss an action over which it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1), (h)(3). In considering a 12(b)(1) motion to dismiss, the burden is on the plaintiff to prove that the federal subject matter jurisdiction is proper. *See United States v. Hays*, 515 U.S. 737, 743 (1995) (citing *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). There are two ways in which a defendant may present at 12(b)(1) motion. First, a defendant may attack the complaint on its face when the complaint "fails to allege facts upon which subject matter jurisdiction may be based." *Adams*, 697 F.2d at 1219. Under this method of attack, all facts as alleged by the plaintiff are assumed to be true. *Id*.

Alternatively, a 12(b)(1) motion to dismiss may attack the existence of subject matter jurisdiction over the case apart from the pleadings. *See Williams v. United States*, 50 F.3d 299,

304 (4th Cir. 1995) (citing *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)); *White v. CMA Contr. Co.*, 947 F. Supp. 231, 233 (E.D. Va. 1996). In such a case, the trial court's "very power to hear the case" is at issue. *Mortensen*, 549 F.2d at 891. The district court is then free to weigh the evidence to determine the existence of jurisdiction. *Adams*, 697 F.2d at 1219. "No presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen*, 549 F.2d at 891.

### B.  Failure to State a Claim

A Federal Rule of Civil Procedure 12(b)(6) motion should be granted unless an adequately stated claim is "supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 561 (2007) (internal citations omitted); *see* Fed. R. Civ. P. 12(b)(6). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Twombly*, 550 U.S. at 555. A complaint is also insufficient if it relies upon "naked assertions devoid of further factual enhancement." *Id*.

To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "a claim for relief that is plausible on its face." *Id*.; *Twombly*, 550 U.S. at 570. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 556. In considering a Rule 12(b)(6) motion, the Court must construe the complaint in the light most favorable to the plaintiff, read the complaint as a whole, and take the facts asserted therein as true. *E. Shore Mkts., Inc. v. J.D. Assoc. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000); *Mylan Lab., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). In addition to the complaint, the court may also

examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 127 S. Ct. 2499, 2509 (2007). "Conclusory allegations regarding the legal effect of the facts alleged" need not be accepted. *Labram v. Havel*, 43 F.3d 918, 921 (4th Cir. 1995); *see also E. Shore Mkts., Inc.*, 213 F.3d at 180 ("[w]hile we must take the facts in the light most favorable to the plaintiff, we need not accept the legal conclusions drawn from the facts . . . . [s]imilarly, we need not accept as true unwarranted inferences, unreasonable conclusions, or arguments.").

## III.  ANALYSIS

Defendants argue that Plaintiffs' claims should be dismissed pursuant to both Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The Court will address both of these arguments in turn. For the reasons that follow, this Court finds that it does not lack subject matter jurisdiction over Plaintiffs' claims, but that Plaintiffs have failed to state a plausible claim from which relief may be granted, and as such, Plaintiffs' claims must be dismissed pursuant to Rule 12(b)(6).

### A.  Subject Matter Jurisdiction

Defendants contend that Rule 12(b)(1) warrants dismissal because (1) Plaintiffs have failed to exhaust the requisite remedies under the Individuals with Disabilities Education Act ("IDEA"); and (2) Plaintiffs lack standing.  Dkt. 19, 1-2.  This Court finds that Plaintiffs were not required to exhaust administrative remedies under the IDEA, and that Plaintiffs have standing to bring their claims.

#### i.  Exhaustion

##### a.  Whether Exhaustion is Jurisdictional

Turning to Defendants' first argument regarding jurisdiction – whether the Court lacks subject matter jurisdiction over Plaintiffs' claims because Plaintiffs were required to exhaust, and

did not exhaust, administrative remedies under the IDEA – the threshold question is whether exhaustion is jurisdictional.

As the Supreme Court of the United States has opined:

[t]he Individuals with Disabilities Education Act (IDEA or Act), 84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq., ensures that children with disabilities receive needed special education services. One of its provisions, § 1415(l), addresses the Act's relationship with other laws protecting those children. Section 1415(l) makes clear that nothing in the IDEA "restrict[s] or limit[s] the rights [or] remedies" that other federal laws, including antidiscrimination statutes, confer on children with disabilities.

*Fry v. Napoleon Cnty. Schs.*, 137 S. Ct. 743, 748 (2017). As such, even where a plaintiff *does not* allege a claim under the IDEA, similarly to the Plaintiffs here, under certain circumstances (*infra*, p. 21-22) a plaintiff may still be required to exhaust remedies set forth by the IDEA.

To that end, the United States Court of Appeals for the Fourth Circuit has determined that where administrative exhaustion is required under the IDEA, "[t]he failure . . . to exhaust . . . administrative remedies [under the IDEA] . . . . deprives [courts] of subject matter jurisdiction . . . ." *MM ex rel. DM v. School Dist. of Greenville Cnty.*, 303 F.3d 523, 536 (4th Cir. 2002). This Court has also previously found that where a plaintiff was required to exhaust IDEA remedies prior to filing suit in this Court, failure to do so rendered the Court without subject matter jurisdiction over the claims. *See e.g. A.W. ex. Rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 548 F. Supp. 2d 219, 225 (E.D. Va. 2008) ("In conclusion, this Court dismisses this case for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) because Plaintiffs have an unsatisfied obligation under the IDEA to exhaust all of their administrative remedies.").[12] Thus,

---

[12] In Plaintiffs' Supplemental Authority, Plaintiffs cite to *S.C. v. Round Rock Indep. Sch. Dist.*, No. A-19-CV-1177-SH, 2020 WL 1446857, at *4 (W.D. Tex. Mar. 25, 2020) in support of their argument that their Amended Complaint should not be dismissed pursuant to Rule 12(b)(1) for failure to exhaust administrative remedies. Plaintiffs point out that in *S.C.*, the Western District of Texas concluded that "exhaustion of administrative remedies under the Rehabilitation Act and

should this Court determine that Plaintiffs were required to exhaust administrative remedies under the IDEA, and that Plaintiffs did not do so prior to the commencement of this lawsuit, this Court would be constrained to dismiss the suit for lack of subject matter jurisdiction. However, for the reasons that follow, this Court does not so find.

### b. Whether Exhaustion Under the IDEA was required

Plaintiffs have alleged that Defendants have violated (1) Title II of the ADA (Count One); (2) Section 504 of the Rehabilitation Act (Count Two); and (3) 42 U.S.C. 1983 (Count Three). Although Plaintiffs have not claimed that Defendants have violated the IDEA, one of the statutory provisions provides that:

> [n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

---

ADA is not a jurisdictional requirement; rather, 'it is only a precondition to filing suit, subject to waiver or estoppel defenses.'" 2020 WL 1446857, at *4. However, Plaintiffs failed to point out that in reaching this conclusion set forth in the Western District of Texas's slip opinion, the magistrate judge first recognized that "[w]hile the Fifth Circuit has not specifically ruled on whether exhaustion of administrative remedies under Section 504 is jurisdictional, it has suggested that it is not. *S.C. v. Round Rock Indep. Sch. Dist.*, 2020 WL 1446857, *4 (W.D. Tex. Mar. 25, 2020) (citing *Gardner v. Sch. Bd. Caddo Parish*,958 F.2d 108, 112 (5th Cir. 1992) ("We do not decide whether exhaustion is a jurisdictional requirement. Quite arguably, it is not because there is a judicial exception to exhaustion when exhaustion would be futile or inadequate.")). While the United States Court of Appeals for the Fifth Circuit, which is binding on the Western District of Texas, has not yet determined that failure to exhausted under the IDEA is jurisdictional, the Fourth Circuit, whose decisions bind this Court's judgment, has so determined. *See MM ex rel. DM*, 303 F.3d at 536. Accordingly, this Court on a previous occasion has determined that failure to exhaust under the IDEA is jurisdictional. *A.W. ex. Rel. Wilson*, 548 F. Supp. 2d at 225. Thus, in light of binding Fourth Circuit authority and this Court's highly persuasive precedent, this Court will reject the Western District of Texas's determination that exhaustion under the IDEA is not jurisdictional.

20 U.S.C. § 1415(l). As such, "Section 1415(l) requires that a plaintiff exhaust the IDEA's procedures before filing an action under the ADA, the Rehabilitation Act, or similar laws when (but only when) her suit 'seek[s] relief that is also available' under the IDEA." *Fry*, 137 S. Ct. at 752. The Supreme Court of the United States in *Fry v. Napoleon Cmty. Schs.*, held that to "meet that statutory standard, a suit must seek relief for the denial of a [free appropriate public education ("FAPE")] because that is the only 'relief' the IDEA makes 'available.'" 137 S. Ct. 743, 752 (2017). Accordingly, courts must look to "the substance, or gravamen, of the plaintiff's complaint" when determining whether a plaintiff seeks relief for the denial of a FAPE. *Id*. "The use (or non-use) of particular labels and terms is not what matters. The inquiry, for example, does not ride on whether a complaint includes (or, alternatively, omits), the precise words(?) 'FAPE' or 'IEP.'" *Id*. at 755 (parentheticals in original).

In interpreting the Supreme Court's *Fry* decision, the Fourth Circuit has opined that *Fry* directs "courts to consider two hypothetical questions to decide whether the gravamen of a plaintiff's complaint is a denial of a FAPE." *Z.G. ex rel. C.G. v. Pamlico Cnty. Pub. Schs. Bd. of Edu.*, 774 Fed. App'x. 769, 778 (4th Cir. 2018). First, courts must determine "whether the plaintiff could 'have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school.'" *Id*. (emphasis in original) (quoting *Fry*, 137 S. Ct. at 752). Second, courts are required to decide "whether 'an *adult* at the school . . . [could] have pressed essentially the same grievance[.]'" *Id*. (emphasis in original).

Where both questions are answered affirmatively, it cannot be said that the plaintiff is requesting a FAPE. *Z.G. ex rel. C.G.*, 774 Fed. App'x. at 778. However, where both questions are answered in the negative, "then a plaintiff likely seeks relief for the denial of a FAPE, such that the exhaustion requirement applies." *Id*. at 778-79. For the reasons that follow, this Court finds

that the record requires that both questions be answered affirmatively, and therefore, Plaintiffs were not required to exhaust administrative remedies under the IDEA before brining this matter to the Court's attention.

The answer to the first question of "whether the plaintiff could 'have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school,'" *Id.* (emphasis in original) (quoting *Fry*, 137 S. Ct. at 752), falls in favor of Plaintiffs. In this case, Plaintiffs' allegations include instances where each of the Individual Plaintiffs were subjected physical restraint and seclusion. Dkt. 17, ¶ 123 ("[Plaintiff] Q.T. was regularly secluded for reasons that did not pose an imminent threat to himself or others . . . ."); *id.* at ¶ 136 ("From [f]all of 2016 through May [of] 2019, [Plaintiff] A.O. ha[d] been restrained and secluded on numerous occasions . . . ."); *id.* at ¶ 148 ("From the [f]all of 2018 through June 2019, [Plaintiff] D.O. ha[d] been restrained and secluded at least four times within four weeks for disability-related needs . . . ."); *id.* at ¶ 170 ("Later Ms. Thomas received a third e-mail stating that [Plaintiff] C.T. was 'being very confrontational, cussing, and using sexually inappropriate language.' At that point, [Plaintiff] C.T.'s teacher 'requested to put [Plaintiff] [C.T.] into support,' another term for forced seclusion."); *id.* at ¶ 183 ("throughout the 2018-2019 school year, [Plaintiff] J.M. was subjected to at least 326 documented incidences of seclusion over 62 school days for 28.9 hours."); *id.* at ¶ 224 ("From the spring of 2017 through March [of] 2019, while at Hollin Meadows, [Plaintiff] J.R. reported to Mr. and Mrs. Roby that he was restrained and secluded . . . 4 to 5 days a week."). Defendants argue that because these actions took place in a "school setting," this first question should be answered in the negative. Dkt. 19, 11. However, had another public institution, such as a publicly-funded summer camp, after school program, or library, similarly restrained or secluded

Plaintiffs in the manner in which Defendants are alleged to have done, those institutions might similarly face a discrimination suit under the ADA or Section 504.

Surely, Plaintiffs in their Amended Complaint, set forth facts which discuss the impropriety of restraint and seclusion in an educational setting. However, the inclusion of these facts do not negate the fact that the gravamen on Plaintiffs' Amended Complaint concerns Defendants' alleged unlawful restraint and seclusion of the Individual Plaintiffs. As such, in an instance where a plaintiff alleged that the defendant school district "failed to provide [him], a person with disabilities, the same access, use and enjoyment of education as other students," the United States District Court for the Northern District of Illinois opined:

> Notwithstanding the complaint's language regarding the educational limits Plaintiff ran up against, the crux of the complaint is directed toward discrimination that had nothing to do with a FAPE, and therefore this count may proceed. Preliminarily, the Supreme Court has cautioned against looking at the surface (as opposed to the substance) of a complaint, and therefore the complaint's allusions to [the plaintiff's] educational opportunities cannot be dispositive. *Fry*, 137 S. Ct. at 755. Next, answers to both of [the plaintiff's] hypothetical questions indicate that the crux of this lawsuit is not a FAPE. First, [the plaintiff's] claim that he was singled out for detention, interrogation, and searches, although hard to "divorce from the context of him being a[ ] [ ] student at a school," *J.S., III by and through J.S. Jr. v. Houston Cty. Bd. of Educ.*, 877 F.3d 979, 986 (11th Cir. 2017), could present a cause of action in other contexts. Second, an adult, "such as an employee or a visitor" could press the same claims. Third, the case at bar is on all fours with at least two federal appellate decisions. *Houston County Board of Education*, 877 F.3d 979 (11th Cir. 2017) (per curium), explained that plaintiff's being "excluded and isolated from his classroom and peers on the basis of his disability," although also a violation of his IEP, was not, first and foremost, related to his FAPE. *Id*. at 987. Here, [the plaintiff's] injuries from being pulled out and punished "reach beyond a misdiagnosis or failure to provide appropriate remedial coursework" and therefore do not implicate the IDEA. *Id*. at 987. And *Dallas Independent School District*, 941 F.3d 224 (5th Cir. 2019), explained that plaintiffs do not need to proceed under the IDEA in all suits that "implicate[ ] the denial of [their] educational opportunities." *Id*. at 229.

*Doe v. Twp. High Sch. Dist. 214*, No. 19-cv-3052, 2020 WL 1081726, at *1 (N.D. Ill. Mar. 3, 2020).

Accordingly, Plaintiffs' mention of education-related topics and discussion of the context in which these restraints and seclusions occurred, does not preclude the Court from reaching the determination that Plaintiffs could have brought their claims had these incidents occurred at a public facility that was not a school. *See also A.K.B. v. Indep. Sch. Dist. 194*, No. 19-cv-2421, 2020 WL 1470971, at *6 (Mar. 26, 2020 D. Minn. ) (finding no requirement that the plaintiffs exhaust administrative remedies where the plaintiffs "plausibly alleged that the [school d]istrict is only the 'location' of the discrimination alleged by [p]laintiffs. *Fry*, 137 S. Ct. at 756. And . . . [plaintiff's] medical care was not part of her educational curriculum at school, even though both situations necessarily involve 'educational consequences.' *Id*."); (finding "[t]he factual allegations show the gravamen of the wrongfulness of [the d]efendants' conduct is not that it violated the IDEA, but that it involved unlawful and unreasonable use of physical force against [the plaintiff] . . . .[The p]laintiff's allegations regarding [the d]efendants' obligations or knowledge about [the plaintiff's] tendencies to kick based on the IEP [were] made as an indication of the unreasonableness of the use of force, not to illustrate a denial of an educational benefit.") (citing *K.G. by & through Gosch v. Sergeant Bluff-Luton Cmty. Sch. Dist.*, 244 F. Supp. 3d 904, 921 (N.D. Iowa 2017); *Doe v. Aberdeen Sch. Dist.*, No. 1:18-cv-01025-CBK, 2019 WL 4740163, at *4 (D.S.D. Sept. 27, 2019) (finding that "plaintiffs d[id] not merely claim that the alleged abuse prevented their children from benefitting from a public education. Rather they claim[ed] separate and distinct harm arising from the alleged abuse[,]" and that "[t]he fact that any abuse may have hindered the[ ] disabled children's education [was], at best, a tangential part of plaintiffs' claims, not the crux of their complaint . . . ." where one plaintiff's minor child who was "diagnosed with autism spectrum disorder and moderate cognitive disability" was "the regular subject of physical

and emotional abuse at the hands of" one of the defendants and was "confined to a separate room 'without food, water or a restroom break 274 times[.]'").

Indeed, had the Individual Plaintiffs been so restrained or secluded in another public facility, the Individual Plaintiffs might well be able to state a similar cause of action against those institutions. Accordingly, this Court finds that irrespective of the inclusion of facts that discuss the Individual Plaintiffs' alleged restraint and seclusion in an educational context (after all, these alleged actions did occur in a school), because these claims could still be brought against other publicly-funded facilities, the first *Fry* question must be answered in the affirmative.

Indeed, in *Fry*, the Supreme Court considered a hypothetical situation in which "a teacher, acting out of animus or frustration, strikes a student with a disability, who then sues the school under a statute other than the IDEA." 137 S. Ct. at 756 n. 9. In considering this scenario, the Supreme Court reasoned that:

> [h]ere too, the suit could be said to relate, in both genesis and effect, to the child's education. But . . . that the substance of the plaintiff's claim is unlikely to involve the adequacy of special education—and thus is unlikely to require exhaustion. A telling indicator of that conclusion is that a child could file the same kind of suit against an official at another public facility for inflicting such physical abuse—as could an adult subject to similar treatment by a school official. To be sure, the particular circumstances of such a suit (school or theater? student or employee?) might be pertinent in assessing the reasonableness of the challenged conduct. But even if that is so, the plausibility of bringing other variants of the suit indicates that the gravamen of the plaintiff's complaint does not concern the appropriateness of an educational program.

*Fry*, 137 S. Ct. at 756 n. 9 (internal citations omitted). Accordingly, although the alleged instances of restraint and seclusion took place in a school setting, the gravamen of Plaintiffs' Amended Complaint centers around the alleged restraint and seclusion of Plaintiffs. It may be fairly said that Plaintiff could bring such claims against public facilities other than a school. Therefore, this Court answers the first *Fry* question in the affirmative.

Yet, Defendants rely, in part, on *J.L. ex rel. Leduc v. Wyo. Valley W. Sch. Dist.*, 722 Fed.

App'x 190, 192-93 (3d Cir. 2018), in support of their position. Defendants' reliance on *J.L.*, is

misplaced. In *J.L.*, the United States Court of Appeals for the Third Circuit provided that:

> an examination of [the plaintiff]'s "entire complaint and each of his claims," reveal[ed] that [the plaintiff] s[ought] relief for "a deprivation of his guaranteed rights to a [FAPE]," App. 24. (Compl. ¶ 1) . . . . [N]umerous factual allegations refer[ed] to [the plaintiff]'s entitlement to "special education services, including transportation services," Wyoming Br. 11 (quoting Compl. ¶ 9), the IEP process, id. at 13–15 (citing, e.g., Compl. ¶ 35), and the relationship between [the plaintiff's] IEP and the alleged violations, id. at 14–15; see, e.g., Compl. ¶ 25 ("One ... of the 'related services' listed in the 2013–2014 IEP was 'Special Transportation.' ").

*Id*. at 193. The Third Circuit further explained that the plaintiff in *J.L.*, could not likely bring these

claims against another public facility because:

> Count I [of the plaintiff's complaint] refer[ed] to [the plaintiff]'s "educational rights," a "FAPE," "educational programs," "educational services," the "educational environment," the "educational setting," and J.L.'s "special educational needs," his IEP, and IEP meetings. App. 38–41 (Compl. ¶¶ 53–65). Count II (the due process claim) discusses the defendants' respective duties "to provide [the plaintiff] with Special Education Services" and "transportation services" and alleges that their failure to do so resulted in "a set back and delay in his ability to learn and benefit from the special educational services provided." App. 42–44 (Compl. ¶¶ 66–73).

*Id*. With this rationale, the Third Circuit concluded that under the *Fry* framework, the plaintiff

was subject to exhaustion under the IDEA. *Id*.

Here, Plaintiffs "do not seek relief related to any failure to provide them with a . . . FAPE

. . . [,]" Dkt. 1, ¶ 27, and the gravamen of Plaintiffs' Amended Complaint does not support that

conclusion. Plaintiffs do mention in passing that Defendants required Plaintiff J.R. to obtain an

IEP. *See* Dkt. 17, ¶¶ 219, 220. However, the source of their claims do not stem from the creation

of that IEP. Rather, the claims stem from the alleged unlawful restraint and seclusion of the several

Individual Plaintiffs, irrespective of the creation of an IEP for Plaintiff J.R. Further, none of the

other Individual Plaintiffs take issue with the creation of an IEP. At the heart of the Plaintiffs'

Amended Complaint are concerns with being the Individual Plaintiffs being unlawfully restrained and secluded, and the Court finds that Plaintiffs might have a claim under the ADA, Rehabilitation Act, or § 1983 whether or not such actions were taken within or outside of an educational setting. Accordingly, this Court does not find *J.L.*, to be applicable to the case at bar.

This Court also affirmatively answers the second *Fry* question – "whether 'an *adult* at the school . . . [could] have pressed essentially the same grievance[.]'" *Z.G. ex rel. C.G.*, 774 Fed. App'x. at 778 (emphasis in original) (quoting *Fry*, 137 S. Ct. at 752). On this point, this Court finds that if Defendants restrained or secluded an adult visitor or employee with disabilities, Plaintiffs might be able to pursue a discrimination claim under the ADA or Section 504. As such, the Court must answer this second question in the affirmative.

Therefore, because that both questions are answered in the affirmative, this Court finds that Plaintiffs are not requesting a FAPE, *Z.G. ex rel. C.G.*, 774 Fed. App'x. at 778, and IDEA exhaustion was not required of Plaintiffs.

Moreover, this Court finds that the Fourth Circuit's decision in *Z.G. ex rel. C.G. v. Pamlico Cnty. Pub. Schs. Bd. of Edu.*, is further indicative that Plaintiffs were not required to exhaust under the IDEA. 774 Fed. Appx. 769 (4th Cir. 2018). In *Z.G.*, the court found that the plaintiff had previously sought IDEA procedures, supportive of a finding that exhaustion was required. 744 Fed. App'x. at 779; *see also*, *Fry*, 137 S. Ct. at 757 ("[a] plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE.").

In this case, Defendants urge that because one of the six Individual Plaintiffs, Plaintiff A.O., previously began and abandoned a due process hearing in Virginia, such was Plaintiff A.O.'s abandoned attempt at exhaustion under the IDEA. Dkt. 19, 12. Accordingly, Defendants argue that this therefore suggests that all Plaintiffs were required to exhaust under the IDEA. *Id*.

However, it appears that in those due process proceedings, Plaintiff A.O. did not seek consultation on the incidents of restraint and seclusion, of which Plaintiff A.O. now alleges and seeks remedy for in the case at bar. Rather, in those due process proceedings it appears Plaintiff A.O. sought special education services. Dkt. 24, 12 ("[Plaintiff] A.O. requested a due process hearing to have an expert evaluate whether [Plaintiff] A.O.'s behaviors were a manifestation of her disability in order to decide an appropriate school setting, not restraint and seclusion . . . . The proceeding was not pertinent to any specific instance of restraint and seclusion; instead it related to [Plaintiff] A.O.'s overall placement [at Burke Alternative Learning Center and whether Plaintiff A.O. could return to a general education environment].") (citing Dkt. 24-4, ¶¶ 2-9). As such, this Court finds that the commencement of the due process proceeding in this context, is not indicative that exhaustion was required for these claims specifically concerning restraint and seclusion of Plaintiffs.

Further, the Fourth Circuit in *Z.G.* highlighted that the "crux of [plaintiffs'] claims [was] an effort to alter Z.G.'s educational placement, secure certain educational services, and ensure the plaintiffs' procedural rights guaranteed by the IDEA." 744 Fed. App'x. at 779. The district court from which the plaintiff, Z.G., appealed, found that:

> [the] [p]laintiffs' ADA claim . . . involve[d] the details of Z.G.'s classroom situation and the ability of the school to properly accommodate his disability. . . . [the] [p]laintiffs' section 504 claim . . . likewise challenge[d] Z.G.'s placement in an educational program that is not the 'le[ast] confining program that satisfies his educational needs.' . . . The section 1983 claim in count five contest[ed] the conditions of Z.G.'s educational situation, Z.G.'s inability to participate in 'regular education activities,' and the school's response to the manifestations of Z.G.'s disabilities.

*Z.G. v. Pamlico County Pub. Schs. Bd. of Educ.*, No. 4:15-CV-183-D, 2017 U.S. Dist. WL 477771, at *8 (E.D.N.C. Feb. 3, 2017). The Eastern District of North Carolina's characterization of the claims at issue in *Z.G.*, can not be said of the claims alleged in the instant matter. Here, Plaintiffs'

claims before this Court state a stronger case for discrimination outside of a denial of FAPE, as here Plaintiffs describe the use of restraint and seclusion as tools of oppressive discrimination, not just as inadequate tools of education. *See e.g.* Dkt. 17, ¶ 2 ("Plaintiffs bring this action to hold Defendants accountable for the excessive and unjustified discrimination, psychological trauma, and physical harm inflicted by their illicit use of restraints and seclusion to silence, detain, segregate, and punish students with disabilities."). Here, the gravamen of Plaintiffs' Amended Complaint takes issue with an allegedly discriminatory practice and does not merely raise an issue with the Individual Plaintiffs' "educational placement," the "educational services" afforded to them, or seek to "ensure the [Individual P]laintiffs' procedural rights guaranteed by the IDEA." *See Z.G.*, 744 Fed. App'x at 779.

As such, this Court finds that exhaustion was not required. Because this Court finds that exhaustion was not required, this Court will not address whether Plaintiffs would qualify for one of the recognized exhaustion exceptions.

### *ii. Standing*

In support of their 12(b)(1) attack, Defendants further argue that Plaintiffs lack standing. More specifically, Defendants' position is that both the Individual Plaintiffs and the Organizational Plaintiffs have failed to establish standing. Defendants contend that the Individual Plaintiffs lack standing because some of their requests for relief sweep beyond what this Court may grant them. Dkt. 19, 16. Additionally, Defendants allege that the Organizational Plaintiffs lack standing because (1) they have not suffered a concrete injury and (2) the members of their organization have not suffered a particularized injury. *Id*. at 18, 21. The Court will consider each argument.

### a. Whether the Individual Plaintiffs Lack Standing

Plaintiffs are required to demonstrate standing for each form of relief sought. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).

Plaintiffs' Amended Complaint sets forth a total of 22 requests for relief. Dkt. 17, ¶¶ A-V. Defendants do not appear to challenge the Individual Plaintiffs' request for individualized relief including declarations that Defendants violated these Plaintiffs' rights and compensatory damages. Dkt. 19, 16. Instead, Defendants challenge requests for relief (E) through (S). *Id*. at 16-17. Defendants argue that the requests for "sweeping, system-wide injunctive relief concerning how restraint and seclusion generally are used across the school system" go beyond what the Individual Plaintiffs can be granted by this Court. *Id*. at 16. To this point, Defendants further assert that injunctions requiring Defendant Fairfax County School Board to provide and fund certain services to students with disabilities are unnecessary when a narrower injunction tailored to the needs of a particular student would remedy Plaintiffs' claims. *Id*. at 18.

Conversely, Plaintiffs attest that the ADA and Section 504 permit the Individual Plaintiffs to pursue the "full panoply of legal remedies[.]" Dkt. 24, 18 (citing *Adams v. Montgomery Coll. (Rockville)*, 834 F. Supp. 2d 386, 393 (D. Md. 2011)). Plaintiffs cite to *Olmstead v. L.C. ex rel. Zimring*, where the Supreme Court affirmed injunctive relief requiring the state of Georgia to release two plaintiffs from institutions and to overhaul its mental health system. 527 U.S. 581, 602 (1999).

"To meet the minimum constitutional requirements for standing, a plaintiff must establish three elements: (1) that the plaintiff has sustained an injury in fact; (2) that the injury is traceable to the defendants' actions; and (3) that the injury likely can be redressed by a favorable judicial

decision." *Daniels v. Arcade, L.P.*, No. 11-1191, 2012 WL 1406299 at *3 (4th Cir. 2012) (citations omitted).

Here, the Individual Plaintiffs clearly satisfy the first two requirements of this standard, and the Court finds that the requested relief would likely remedy their situation. This Court retains the ability to tailor relief should Plaintiffs succeed in this case.

Additionally, the relief afforded to complainants must be narrowly tailored to be "no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (finding that in a class action "the fact that the class is nationwide in scope does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties").

In this matter, the contested relief would consist of reforms to the Fairfax County Public School ("FCPS") system, including that Defendants would "develop and implement a Response to Intervention Program . . . hire a qualified consultant(s) to assist Defendants to make material changes to FCPS' systems . . . hire, train, coach, coordinate, and evaluate sufficient staff and employees on evidence-based practices to avoid restraint and seclusion and to use in its place trauma informed PBIS."[13] Dkt. 17, ¶¶ F-H. Despite the magnitude of the impact that the requested forms of relief may have on the FCPS, this does not mean that the Amended Complaint should be dismissed at this point for a lack of standing. As Plaintiff provides, the ADA "should be construed broadly to effectuate its purposes[,]" and "as with any equity case, the nature of its violation determines the scope of the remedy." Dkt. 24, 18 (quoting *Tcherepnin v. Knight*, 389 U.S. 332,

---

[13] PBIS is an acronym for "Positive Behavioral Intervention and Supports." Dkt. 17, ¶ 17d. By Plaintiffs' account, a PBIS would include "trauma informed practices, positive educational and preventative practices and services to respond to students' disability-related needs without restraint and seclusion[.]" *Id.*

336 (1967); *Swann v. Charlotte–Mecklenburg Bd. Of Educ.*, 402 U.S. 1, 16 (1971)).  Accordingly, this Court finds that the Plaintiffs do not lack standing due to the scope of the relief they request.

Yet, Defendants cite to the Supreme Court's decision in *Lewis v. Casey*, 518 U.S. 434, 359 (1996), and the Fourth Circuit's decision in *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003) in support of their position.

In *Lewis*, 22 inmates of various prisons operated by the Arizona Department of Corrections brought a class action suit "on behalf of all adult prisoners who [were] or [would be] incarcerated by the State of Arizona Department of Corrections[.]" 518 U.S. at 346 (internal citations omitted). The prisoners argued that the Arizona Department of Corrections were "depriving [the prisoners] of their rights to access the courts and counsel protected by the First, Sixth, and Fourteenth Amendments."  *Lewis v. Casey*, 518 U.S. 434, 436 (1996).  After a three-month bench trial, the district court found for the prisoners. *Id*. 346-47.  Following the finding of liability, the district court entered a "25-page injunctive order" which "mandated sweeping changes designed to ensure that [the Arizona Department of Corrections] would 'provide meaningful access to the [c]ourts for all present and future prisoners.'"  *Id*. at 347.

The Supreme Court further described that the injunctive order:

> specified in minute detail the times that libraries were to be kept open, the number of hours of library use to which each inmate was entitled (10 per week), the minimal educational requirements for prison librarians (a library science degree, law degree, or paralegal degree), the content of a videotaped legal-research course for inmates (to be prepared by persons appointed by the Special Master but funded by ADOC), and similar matters. . . The injunction addressed the court's concern for lockdown prisoners by ordering that "ADOC prisoners in all housing areas and custody levels shall be provided regular and comparable visits to the law library," except that such visits "may be postponed on an individual basis because of the prisoner's documented inability to use the law library without creating a threat to safety or security, or a physical condition if determined by medical personnel to prevent library use." With respect to illiterate and non-English-speaking inmates, the injunction declared that they were entitled to "direct assistance" from lawyers, paralegals, or "a sufficient number of at least minimally trained prisoner Legal

> Assistant"; it enjoined ADOC that "[p]articular steps must be taken to locate and train bilingual prisoners to be Legal Assistants."

*Id*. at 347-48. Having considered the scope of the harm suffered by the prisoners and the scope of the injunction, the Supreme Court determined whether the "inadequac[ies of the Arizona Department of Corrections] was widespread enough to justify systemwide relied[.]" *Id*. at 359. The Court found that in all of the Arizona Department of Correction's facilities, there were only two instances that warranted the injunctive relief that was granted. *Id*. Ultimately, the Court found that "[t]hese two instances were a patently inadequate basis for a conclusion of systemwide violation and imposition of systemwide relief." *Id*. (citing *Dayton Bd. of Ed. v. Brinkman*, 433 U.S. 406, 417 (1977); *Califano*, 442 U.S. at 702 (1979)).

Juxtaposing *Lewis* with the case at bar, it is not clear that *Lewis* requires that this Court dismiss this case for a lack of standing. First, from a quantitative standpoint, this case is distinguished from the matter which the Supreme Court decided in *Lewis*. 518 U.S. at 359. In *Lewis*, the Supreme Court only found two instances that would justify the imposition of the sweeping injunctive relief that the district court granted. *Id*. The limited instances of harm played a significant part in the Supreme Court's disposition that the sweeping relief the district court granted was not warranted based on the harm that the plaintiff's faced. *Id*. at 359. In this matter, there are six Individual Plaintiffs, who allege multiple instances in which they were restrained or confined, and they argue that these situations of restraint and confinement resulted from discriminatory practices against students with disabilities. Dkt. 17, ¶¶ 116-34, 135-66, 167-81, 182-214, 215-49. Thus, in comparing the quantity of instances in which the plaintiffs were harmed in *Lewis*, to the case presently before the Court, *Lewis* is distinguishable.

Moreover, the district court in *Lewis* crafted its injunctive order, not only after a three-month bench trial but after the district court "appointed a Special Master 'to investigate and report

about' the appropriate relief[.]" *Id*. at 347. The Special Master then conducted an eight-month investigation, consulted with the parties, and filed a proposed permanent injunction with the district court. *Id*. The district court then adopted the proposed permanent injunction "substantially unchanged." *Id*.

Conversely, this case is in the early stages of litigation, and thus the procedural posture of this matter is distinct from *Lewis*. Should this Court first find for Plaintiffs on the merits and then find that the harm suffered by Plaintiffs is insufficient to warrant the relief of which Plaintiffs request, the relief can then be tailored. At this point, the Court does not find that the relief requested sweeps beyond that which is necessary to provide complete relief to them, such that they would lack standing.

The Court also notes the second case that Defendants cite in support of their argument on standing – *Kentuckian for Commonwealth Inc. v. Rivenburgh*, 317 F.3d at 436. In *Kentuckian for Commonwealth Inc.*, the Fourth Circuit considered the breath of an injunction ordered by a district court. *Id*. In that matter, the court concluded that the injunction was overbroad. *Id*. The court reasoned that the scope of the injunction ordered by the district court was overbroad because the members of the plaintiffs' organization were "entirely within the Commonwealth of Kentucky and [plaintiff's] members alleged injury only in connection with" a coal site in Martin County, Kentucky. *Id*. at 431, 436. Yet, the injunction issued by the district would have "a substantial national impact." *Id*. at 436. Thus, the Fourth Circuit concluded that it was "readily apparent" the relief granted by the district court exceed the scope of the alleged harm. *Id*.

Assessing this matter in light of *Kentuckians for Commonwealth Inc.*, it is not apparent that the remedies which Plaintiffs seek are overbroad such that they warrant dismissal for lack of subject matter jurisdiction on the basis that Plaintiffs lack standing. *Id*. Here, the Individual

Plaintiffs bring claims that they were discriminatorily secluded and restrained at multiple schools within a single school district. Dkt. 17, ¶ 2. To remedy the injury which the Individual Plaintiffs allege to have occurred at various schools within the FCPS, they seek remedies that would address what they have pleaded is a practice within in FCPS. It is possible that throughout the course of litigation it may become clear that the harm that transpired is insufficient to justify the requested remedies but, at this juncture, it is not yet apparent. Therefore, the Court finds that Defendants' argument on this point fails.

### b. Whether the Organizational Plaintiffs Lack Standing

Defendants also argue that the Organizational Plaintiffs lack standing. Dkt. 19, 18-20. Defendants contend that the Organizational Plaintiffs lack standing because (1) they themselves have not suffered a concrete injury; and (2) the members of their respective organizations have not suffered a particularized injury. *Id.* Though it is dubious that based on the facts pleaded in the instant matter, that the Organizational Plaintiffs would have standing had they been the sole plaintiffs of this suit, those are not the circumstances of this case. Instead, the Organizational Plaintiffs are co-plaintiffs with the Individual Plaintiffs, who, for the reasons set forth above (*supra*, p. 31-36), have standing.

To this end, the Court finds *League of United Latin American Citizens – Richmond Region Council 4614 v. Pub. Interest Legal Found.*, highly persuasive and instructive. No. 1:18-cv-00423, 2018 WL 3848404 at *2 (E.D. Va. Aug. 13, 2018). In *League of United Latin American Citizens*, this Court recognized that "both the Supreme Court and the Fourth Circuit have held that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." 2018 WL 3848404 at *2 (citing *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *Vill.*

*of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-64 (1977); *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014)).

Acknowledging this requirement, this Court opined that it "ought not inquire into [the plaintiff's] organizational standing" in addressing the defendant's motion to dismiss because the individually named plaintiffs had undisputed standing. *League of United Latin American Citizens – Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-cv-00423, 2018 WL 3848404 at *2 (E.D. Va. Aug. 13, 2018). This Court further noted that "the 'One Good Plaintiff Rule' is often limited to cases where each Plaintiff raises the same legal issues and requests the same type of remedy.'" *Id.* (citing *Sierra Club v. El Paso Props., Inc.*, No. 01-cv-02163, 2007 WL 45985, at *2-3 (D. Colo. Jan. 5, 2007); *PSINet, Inc. v. Chapman*, 108 F. Supp. 2d 611, 619-20 (W.D. Va. 2000)). Therefore, the Court "invite[d] further briefing on the matter following discovery, should there be cause." *Id.*

Accordingly, this Court will address the Organizational Plaintiffs' standing in this matter in the same fashion that this Court did in *League of United Latin American Citizens*. *Id.* at *2. Because the Individual Plaintiffs have standing, and the Organizational Plaintiffs raise the same claims and request the same forms of relief as do the Individual Plaintiffs at this juncture, the "One Good Plaintiff Rule" is satisfied at this juncture.

### B. Failure to State a Claim

Further, Defendants posit that each of Plaintiffs' claims should be dismissed under Rule 12(b)(6) because Plaintiffs have failed to state a plausible from which relief may be granted. Dkt. 19, 2. The Court will address each count of Plaintiffs' Amended Complaint in turn.

*i. Count One*

Count One of Plaintiffs' Amended Complaint (Dkt. 17) alleges that Defendants violated

Title II of the ADA.  Dkt. 17, ¶¶ 262-84.  Plaintiffs cite to 42 U.S.C. § 12132 which provides that

"no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity,

or be subjected to discrimination by any such entity."  *See id*. at ¶ 265.

Plaintiffs allege that:

Defendants have systemically violated Title II of the ADA by routinely excluding
students with disabilities from the benefits and services of a publicly funded
educational institution.  By unnecessarily using restraint and seclusion as a
disciplinary measure against students with disabilities, Defendants' actions and
inaction have culminated in hostile learning environments that deny Plaintiffs the
participation in or receipt of benefits, services, or opportunities

* * * *

Defendants have treated students with disabilities differently from students without
disabilities by placing them in isolation cells in response to insubordination or
minor behaviors

* * * *

Defendants' disproportionately use restraint and seclusion on students with
disabilities as punitive measures

* * * *

Moreover, Defendants' overuse of restraint and seclusion segregates students with
disabilities from their classrooms and classmates and, thus, fails to serve them in
the most integrated setting appropriate to their needs.

*Id*. at ¶¶ 274, 275, 281.

To successfully plead a claim under Title II of the ADA, a complainant must plead that

"(1) she has a disability, (2) she is otherwise qualified to receive the benefits of a public service,

program, or activity, and (3) she was excluded from participation in or denied the benefits of such

service, program, or activity, or otherwise discriminated against, on the basis of her disability."

*Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).

Defendants argue that neither the Organizational nor the Individual Plaintiffs have satisfied the pleading requirements under the ADA.

### a. The Organizational Plaintiffs

Defendants explain that the Organizational Plaintiffs' claim fails because they have not alleged that any of their members were subjected to the same adverse action – restraint or seclusion – as the Individual Plaintiffs. Dkt. 19, 24. Defendants' position is that the Organizational Plaintiffs themselves "do not have a cognizable claim under the ADA aside from any claim their members may have. The organizations are not qualified individuals with a disability, and their resources and mission are not public aid, benefit, or service – certainly not one the School Board is tasked with providing." *Id.* at 24 n. 14.

The Court is persuaded by Defendants' argument on this point, and the Court finds that the Organizational Plaintiffs have failed to sufficiently plead each of the three elements required to sufficiently allege a claim under Title II of the ADA. As Defendants explain, the only way that the Organizational Plaintiffs could demonstrate the first and second elements – having a disability and qualification to receive the benefits of a public service, program, or activity – would be through its members. At this juncture, the Organizational Plaintiffs have not specifically pleaded that any of its members have been discriminated against in violation of the ADA. Plaintiffs do generally allege that the Organizational Plaintiffs' members were discriminated against, but they have provided no particularized facts in support of this simple legal conclusion. *See* Dkt. 17, ¶ 1. Therefore, not only have the Organizational Plaintiffs insufficiently pleaded the first and second elements, the third element is also not met because Plaintiffs have not sufficiently pleaded that any

of the Organizational Plaintiffs' members have been discriminated on the basis of their disabilities. Thus, the Court finds that the Organizational Plaintiffs have failed to defeat Defendants' attack in this regard.

### b. The Individual Plaintiffs

Defendants also argue that the Individual Plaintiffs have not sufficiently pleaded that they were discriminated on the basis of their disability because their pleadings do not show that their disabilities played a "motivating role" in their restraint or seclusion. The Fourth Circuit has determined that "if a plaintiff claiming discrimination under § 12132 demonstrates that his or her disability played a motivating role" in the defendants' alleged discriminatory actions, "the plaintiff is entitled to relief." *Baird ex. Rel. Baird v. Rose*, 192 F.3d 462, 470 (4th Cir. 1999); *see also Constantine*, 411 F.3d 474, 498 (4th Cir. 2005) ("A plaintiff seeking relief under Title II of the ADA must prove that disability 'played a motivating role' in the adverse action."). Thus, at the pleading stage, a plaintiff must plead sufficient facts to support a plausible claim that the plaintiff's disability played a motivating role in the defendant's discriminatory action.

The court finds that the Individual Plaintiffs have met the pleading requirements on this point. It is uncontested and Plaintiffs have sufficiently pleaded, that the Individual Plaintiffs have a disability and that they are otherwise qualified to receive the benefit of the FCPS' public service. *Constantine*, 411 F.3d at 498. However, Defendants take issue with Plaintiffs' pleadings as to the third element – that "[the Individual Plaintiffs] w[ere] excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [t]he[i]r disability." *Id*. The Court is unpersuaded by Defendants' argument on this point.

Plaintiffs have argued the conclusion that Defendants have treated students with disabilities differently from students without disabilities. Dkt. 17, ¶ 275. Specifically, in support of their ADA claim, Plaintiffs have cited to 28 C.F.R. § 35.130(d) that requires "a public entity [to] administer . . . programs . . . in the most integrated setting appropriate to the needs of qualified individuals with disabilities." Dkt. 17, ¶ 270 (citing 28 C.F.R. § 35.130(d)). One manner in which the Individual Plaintiffs contend they were discriminated against was that they were secluded and removed from the general education population where, construing the Amended Complaint in the light most favorable to Plaintiffs, it can be inferred that other students who were not disabled were taught. This alleged segregation of the disabled Plaintiffs from the non-disabled individuals in the FCPS' general education population suggests that "[the Individual Plaintiffs] w[ere] excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of [t]he[i]r disability," *Constantine*, 411 F.3d at 498, and that the Individual Plaintiffs' disabilities "played a motivating role" in the defendants' alleged discriminatory actions. *Baird ex. Rel. Baird*, 192 F.3d at 470. Accordingly, the Court finds that the Individual Plaintiffs have pleaded sufficient facts in support of Count One of their Amended Complaint.

### ii. Count Two

However, claims raised under § 504 of the Rehabilitation Act are subject to a more stringent standard than those raised under Title II of the ADA. As the Fourth Circuit articulated in *Constantine v. Rectors & Visitors of George Mason Univ.*, "[a] plaintiff seeking relief under Title II of the ADA must prove that disability 'played a motivating role' in the adverse action, while a plaintiff seeking relief under § 504 of the Rehabilitation Act must prove that the defendants' discriminatory conduct was 'solely by reason' of the plaintiff's disability." 411 F.3d 474, 498 n.

17 (4th Cir. 2005) (emphasis added). Thus, while under a Title II ADA claim, a plaintiff's disability may be *one* of multiple motivating factors giving rise to the alleged discriminatory conduct, under § 504 of the Rehabilitation Act, the plaintiff's disability must be the one and only reason for the defendant's discriminatory action. Based on the facts set forth in the Amended Complaint, it may be said that the Individual Plaintiffs' disabilities played "*a* motivating role" in the alleged discriminatory seclusion. However, this Court finds that the Individual Plaintiffs have not pleaded sufficient facts to indicate that their disabilities were the *sole* reason for Defendants' discriminatory conduct. Rightly or wrongly, it appears that other reasons motivating Defendants' discriminatory seclusion of Individual Plaintiffs could be classroom management, and a desire to protect the safety of the teachers and other students within the classroom. Accordingly, the Court finds that Plaintiffs' Rehabilitation Act claim fails to survive Defendants' 12(b)(6) attack.

### iii.   Count Three

In Count Three of their Amended Complaint, Plaintiffs claim that Defendants have violated 42 U.S.C. § 1983 by "depriv[ing] Plaintiffs of their Fourth and Fourteenth Amendment rights under color of law by subjecting them to unlawful seizures denying them due process of law, and denying them educational opportunities equal to non-disabled students." Dkt. 17, ¶ 297.

42 U.S.C. § 1983 provides, *inter alia*, that

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . .

42 U.S.C. § 1983. The Supreme Court has determined that "a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dept. of Soc. Servs. of City of New York*,

436 U.S. 658, 691 (1978). "Local governing bodies," such as a school board "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id*. at 690.

In this case, the Plaintiffs do not challenge the School Boards' *policies* as set forth in the Guidelines. *See* Dkt. 17, ¶ 82 ("FCPS Guidelines first adopted in 2012 purport to limit the use of physical restraint and seclusion to instances 'when less restrictive alternatives have failed and [when a ] student is an immediate danger to him or herself and/or others.'") (quoting FCPS Guidelines) (modification in Amended Complaint); *id*. at ¶ 282 ("Defendants' disproportionate use of restraint and seclusion, failure to follow federal law as it relates to restraint and seclusion, and *failure to follow its own guidelines has the effect of discriminating against and disparately affects students with disabilities*.") (emphasis added). Rather, the Plaintiffs' challenge the way that various teachers and staff have diverged from the Defendants' Guidelines in allegedly restraining the Individual Plaintiffs. *Id*.

The Plaintiffs argue that they have satisfied the pleading requirements with respect to § 1983, because their Amended Complaint is "rife with examples demonstrating students with disabilities are subjected to a policy on restraint and seclusion that differs from FCPS Guidelines." Dkt. 24, 28 (citing Dkt. 17, ¶¶ 44, 49, 70, 71, 84-85, 113, 304). However, that argument misses the point. Defendants in this suit are a school board, the superintendent of the corresponding school district acting in his official capacity, and an assistant superintendent of that same school district acting in her official capacity. Accordingly, to file suit against Defendants, Plaintiffs must challenge the Fairfax County School Board's policies. Plaintiffs cannot bring a *pseudo respondeat*

*superior* challenge which takes issue with the actions of FCPS teachers and staff despite the school board's clear policy on the issue. Therefore, Plaintiffs' claim with respect to § 1983 must also fail.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendants' Motion (Dkt. 18) is DENIED in part and GRANTED in part.  To the extent that Defendants request that this Court find that the Court lacks subject matter jurisdiction over Plaintiffs' claims, the Motion is DENIED. To the extent Defendants argue that in Counts Two and Three of their Amended Complaint, the Individual Plaintiffs have failed to state a claim, the Motion is GRANTED.  The Motion is DENIED as to Defendants' Rule 12(b)(6) argument pertaining to Count One of the Individual Plaintiffs' Amended Complaint.  The Motion is GRANTED pursuant to Rule 12(b)(6) on all counts as they relate to the Organizational Plaintiffs.

Accordingly, IT IS FURTHER ORDERED that Counts Two and Three of the Amended Complaint (Dkt. 17) be DISMISSED, without prejudice.  This Court grants the Individual Plaintiffs leave to amend their Amended Complaint.

IT IS FURTHER ORDERED that Counts One, Two, and Three of the Amended Complaint (Dtk. 17) be DISMISSED, without prejudice, as it pertains to the Organizational Plaintiffs.  This Court grants the Organizational Plaintiffs leave to amend their Amended Complaint.

It is SO ORDERED.

Alexandria, Virginia
July 14, 2020

_____ /s/
Rossie D. Alston, Jr.
United States District Judge